CHARLES YEAGER, RESPONDENT, v. ST. JOSEPH LEAD COMPANY, APPELLANT.*—12 S. W. (2d) 520.

St. Louis Court of Appeals. Opinion filed January 9, 1929.

*Corpus Juris-Cyc References: Appeal and Error, 4CJ, section 3031, p. 1049, n. 82; Master and Servant, 39CJ, section 1336, p. 1146, n. 47; Release, 34Cyc, p. 1060, n. 13; p. 1076, n. 42; p. 1103, n. 18; p. 1106, n. 37.

*P. S. Terry* for appellant.

248

*W. A. Brookshire, Abbott, Fauntleroy, Cullen & Edwards* and *John C. Vogel* for respondent.

SUTTON, C.—This is an action to recover damages for personal injuries sustained by plaintiff while engaged in the work he was required to do as an employee of defendant. The injury occurred on November 6, 1924. The trial, which was had on September 21, 1927, with a jury, resulted in a verdict and judgment for plaintiff for $2000, and defendant appeals.

At the time of his injury, plaintiff was working in defendant's mine in St. Francois county. The mine is something over 400 feet deep. There are two levels in the mine. Plaintiff was working on the lower level. The upper level is about eighty feet above the lower level. A chute or tunnel about eighty feet long extends diagonally from the upper to the lower level. The walls of the chute are made of rock, except the lower end, which is made of lumber. The chute is about ten feet square. The lower end of the chute, which is made of lumber, is about three one-half to four feet square. At the lower end of the chute, there is an iron door, which is operated with a lever. The chute was used to convey lead-bearing rocks from the upper to the lower level. The rocks were loaded into cars at the lower level, being discharged directly from the chute into the cars. When no cars were being loaded, the door of the chute was kept closed. It was the plaintiff's duty to tend the chute and punch the rocks with a crowbar so that they might flow through freely, and he had been engaged in that work for about two years. The rocks customarily sent through the chute were not larger than twelve inches in diameter, but occasionally rocks two and one-half to three feet in diameter were sent through. These rocks were difficult to handle, and were dangerous to plaintiff. He was so situated that he could not see or determine the size of the rocks in the performance of his work until they fell down and were discharged from the chute. The rocks in passing through the chute would become choked, and it was necessary for plaintiff to use the crowbar to loosen the rocks so that they would fall out through the door. The choking was worse when large rocks were sent through the chute. These large rocks were so heavy that when they became choked in the chute and were dislodged by plaintiff by the use of the crowbar they fell down through the door of the chute with such force as to be dangerous to plaintiff in the performance of his work. It was one of these large rocks that caused the plaintiff's injury. Plaintiff frequently complained to his foreman for sending these large rocks through the chute. He made such a complaint to the foreman on the morning of his injury, before he was injured, and the foreman promised him

to have the rocks broken up, and directed him to go ahead with the work.

Concerning his injury, plaintiff testified: "I was injured between eleven and twelve o'clock in the morning. I used a bar four and one-half or five feet long to punch the rocks loose. I was injured punching the rocks loose, using this bar. I could not tell anything about the size of the rocks that were in there. But they all hung down there, and I punched them loose with the bar and they dropped. This big one, it caught my hand. There were several of these rocks all wedged in there. It caught my hand against the chute and the iron door. It was my right hand. When I went to jerk the bar down it got my hand down this way on the top of the iron door. A big rock fell down and went out. It mashed my hand. It bursted the little finger and the one next to the little finger. It broke the bone next to the little finger."

After plaintiff's injury, defendant's superintendent sent him to its physicians for treatment. They had an X-ray picture made of his injured hand, and he remained under their treatment until the 18th of December. On that day he saw the physicians. They made an examination of his hand, and told him that his hand would be all right, possibly weak for a while, but that it would be as well as it ever was, and that there would be no permanent injury. He then went immediately to the office of the defendant's claim agent, who sent him to the defendant's attorney. The attorney told him he was willing to pay him his wages, amounting to $175, and that he could get his job back. Laboring under the belief that his hand was not permanently injured and that he could go ahead with the work the defendant gave him to do, he accepted a check for $175, and signed a release, which is set up by defendant in bar of this action.

It is not disputed that the plaintiff's hand was seriously and permanently injured. This was expressly admitted by defendant at the trial. In January, following the signing of the release, defendant gave plaintiff a job at light work. He worked at this job for about a month, and then the defendant put him to shoveling. He did not have strength enough in his injured hand to use the shovel, and had to quit shoveling. He was then laid off for quite a while before defendant gave him another job. He testified that his hand was just weak; that he didn't have any use of the two injured fingers and that part of his hand; that he could straighten the little finger and the next one only about half; that he had been unable to straighten these fingers since his hand was injured; that he could not lift anything any more, only what he could lift with two fingers and thumb; that he could not grasp anything like he used to; that finding his hand did not get better but seemed to grow worse, he went to see one of defendant's physicians, who it seems had not previously examined

·or treated him, and that this physician tried to straighten his fingers, and told him that he had a crippled hand for life; that he then consulted a lawyer, tendered a return of the money he had received from defendant in settlement of his claim, and brought this suit.

No witnesses were produced on behalf of the defendant. The physicians who examined and treated plaintiff and told him his injuries were not permanent did not testify.

Defendant insists here that the release given by plaintiff is a conclusive bar to this action, and that the court below erred in refusing to so rule. It is well settled that a release of a claim for personal injuries may be avoided if given in reliance on fraudulent misrepresentations made by the releasee's physician as to the nature or extent of the injuries. The misrepresentations of the physician may sometimes be of such a nature that fraud cannot be predicated upon them, because they should be regarded merely as expressions of opinions honestly entertained. On the other hand, the misrepresentations may relate to an existing physical condition of the injured party, and in such case the releasee cannot prevent avoidance of the release on the theory that the misrepresentations were merely expressions of opinion on which fraud may not be predicated. And the question whether the misrepresentations should be regarded as misrepresentations of fact or mere expressions of opinion may be for the jury under all the evidence. Moreover, fraud may be predicated upon the giving of a mere opinion by the physician if the opinion is not honestly given. If he fraudulently gives an opinion to the patient regarding the nature and extent of the injuries or the probable time required for recovery, thereby misleading the patient into executing a release, the avoidance of the release cannot be defeated on the ground that the statement was not one of fact but merely of opinion. If a physician falsely represents that he entertains a stated opinion, this is as much a fraud as the false representation of any other fact. Of course, the evidence must show or warrant the inference that the representation was false. [Carroll v. United Railways Co., 157 Mo. App. 247, 137 S. W. 303; Wingfield v. Wabash R. Co., 257 Mo. 347, 166 S. W. 1037; St. Louis-San Francisco Ry. Co. v. Cauthen, 48 American Law Reports 1447, l. c. 1486.] We think the plaintiff here made out a submissible case of fraud in the procurement of the release.

There is no merit in the contention of defendant that the evidence fails to show any negligence on the part of defendant resulting · in plaintiff's injury. The evidence was amply sufficient to take the case to the jury on that issue.

Plaintiff at the trial abandoned fraud in the *factum,* pleaded by him along with fraud in the treaty, to defeat the release set up by defendant, and went to the jury solely on the issue of fraud in the

treaty. There was therefore no harmful error in the refusal of defendant's instruction seeking to withdraw the issue of fraud in the *factum* from the consideration of the jury. [Gebhauer v. J. Hahn Bakery Co. (Mo. App.), 285 S. W. 170; Dietzman v. St. Louis Screw Co. (Mo.), 254 S. W. 59; Siberell v. St. Louis-San Francisco R. Co. (Mo.), 9 S. W. (2d) 912; Burton v. Phillips (Mo. App.), 7 S. W. (2d) 712; Reith v. Tober (Mo.), 8 S. W. (2d) 607; Northern v. Chesapeake & Gulf Fisheries Co. (Mo.), 8 S. W. (2d) 982; Johnson v. Wabash R. Co., 259 Mo. 534, 168 S. W. 713; Snyder v. Western Union Telegraph Co. (Mo. App.), 277 S. W. 362.]

Plaintiff's instruction No. 1 is objected to by defendant as erroneous, on the ground that it permits a verdict for plaintiff, if the jury find the facts hypothesized rendering the release invalid for fraud, regardless of their finding on other issues. A similar instruction was reviewed in Wingfield v. Wabash Railroad Co., 257 Mo. 347, 166 S. W. 1037, and was held not bad as against this objection. The instruction in this case, as in that, does not direct a verdict for plaintiff. Nor does the instruction taken as a whole undertake to detail a state of facts and then tell the jury if they find such facts they shall find for the plaintiff. The most that can be said of this instruction in this respect is that it outlines a state of facts and then tells the jury that if they find such facts then the release constitutes no defense to the action except that the sum of $175 paid plaintiff under said release should be deducted from any verdict returned in favor of plaintiff. The question of liability or no liability for negligence is not mentioned, nor is the matter of contributory negligence or assumption of the risk. But in this case the jury were fully instructed at the request of defendant as to the question of liability or no liability for negligence. No instruction was given on the question of contributory negligence, or on assumption of the risk, and none was requested. The defendant, as it doubtless well understood, had a right to request instructions on these phases of the case if it saw fit to do so. The jury by plaintiff's instruction were not directed or given to understand that they must find a verdict for plaintiff on the facts hypothesized, but they were told only that the release constituted no defense except as to the credit mentioned, and were left free to determine for themselves the other issues and return their verdict accordingly. There was no error in the giving of this instruction.

A further point remains to be disposed of. As the result of an accident which occurred on April 2, 1925, plaintiff suffered a slight injury to his back. On April 11, 1925, plaintiff in consideration of $20 paid him by defendant executed to defendant a release, which he understood to relate solely to this injury. Said release recites that Chas. Yeager in consideration of the sum of $20 to him paid by

St. Joseph Lead Company forever releases said company from any and all claims and demands for any damages, loss or injury resulting from the accident which occurred on April 2, 1925, and then proceeds as follows:

"It is further understood and agreed that for the same consideration said company is also hereby released and forever discharged from any and all claims or demands for injuries, illness, wages or losses or damages of any kind whatsoever the cause or basis for which shall have arisen or originated previous to the date of this release."

Defendant insists here that this release is a conclusive bar to this action, and that the court below erred in refusing to so rule. Defendant bases this insistence on the clause of the release just quoted.

Concerning the execution of this release, plaintiff testified: "I was off about ten days that time I settled that claim. I settled it for $20. I settled it with defendant's attorney. I went voluntarily to his office. I signed the release. My injury got all right. It was all right before I went to settle it. When I went to settle with the attorney, he paid me half time, which was $20. There was nothing said about releasing this injury to my hand. He told me to sign my name to the paper. I didn't know what it was. The only thing I was thinking about was this injury in April. I didn't know the contents of the release when I signed it."

It is manifest that in the execution of this release the injuries to plaintiff's hand were not within the contemplation of the parties. Persons often use general language when speaking of the subject on which the mind is then employed. If another subject be presented to the mind in connection with it, the language used usually gives some indication of it. And when it does not, it should be considered as applicable to the subject of thought only. Language, however general in its form, when used in connection with a particular subject-matter, will be presumed to be used in subordination to that matter, and will be construed and limited accordingly. This is a venerable and universally recognized rule of construction, and it has controlling application to the release now under review. [Grumley v. Webb, 44 Mo. 444; Blair v. Chicago & Alton R. Co., 89 Mo. 383, 1 S. W. 350.]

The commissioner recommends that the judgment of the circuit court be affirmed.

PER CURIAM:—The foregoing opinion of SUTTON, C., is adopted as the opinion of the court. The judgment of the circuit court is accordingly affirmed. *Daues, P. J.,* and *Becker* and *Nipper, JJ.,* concur.