245 S.W.2d 80 (1952)
WOOD
v.
ROBERTSON et al.
No. 42136.
Supreme Court of Missouri, Division No. 1.
January 14, 1952.
*81 Neale, Newman, Bradshaw, Freeman & Neale, Springfield, Fields & Low, John F. Law, Lebanon, for appellant.
A. P. Stone, Jr., Sam M. Wear, Springfield, A. W. Landis, Robert L. Hyder, West Plains, for defendants Page Robertson and Dorothy Robertson.
Stewart & Turner, Sam M. Wear, Springfield, Green & Green, West Plains, for defendant Albert L. Patterson, Jr.
VAN OSDOL, Commissioner.
Plaintiff Edna Faye Wood and her husband Bennie F. Wood instituted this action stating their respective claims in two counts to recover the aggregate amount of $70,000 for personal injury to and loss of services of the wife stated to have been occasioned by a collision of motor vehicles, March 8, 1948, at a street intersection in Springfield. An ambulance, allegedly owned and operated by defendants Page and Dorothy Robertson, in which ambulance plaintiff was riding as a passengerpatient, collided with an automobile owned and operated by defendant Albert L. Patterson, Jr.
Defendants pleaded inter alia that they had settled plaintiffs' claims, and that plaintiffs had received amounts in the total sum of $675 agreed upon in settlement and had executed releases. Plaintiffs by reply alleged the releases were executed by plaintiffs in reliance on representations, relating to a doctor's statement or report of the nature and extent of the wife's injury, made by attorneys for defendants, which representations, it was stated, were false and were made with intent to deceive. The trial court ordered a separate trial of the issue of fraud in the procurance of the releases. Plaintiff husband by his counsel requested and the trial court ordered that the husband's claim be dismissed without prejudice as to all defendants. In the trial of the issue of fraud a jury found for plaintiff Edna Faye Wood. However, the trial court, on defendants' separate motions, set aside the verdict; entered judgment for defendants in accordance with their former motions for a directed verdict; and in the alternative granted a new trial. Plaintiff has appealed.
The contentions of the parties call for a statement of the evidence of the representations averred as fraudulent and of *82 the circumstances in which the representations were made. The case also requires an examination of the law relating to the questions of when and in what circumstances a person alleged to have been defrauded may rely on the representations of the alleged fraud-feasor. Plaintiff-appellant insists she introduced substantial evidence tending to show all of the essential elements of fraud. Defendants-respondents make the primary contention that, in the shown circumstances, plaintiff had no right to rely on the attorneys' statements and should not be permitted to say she was deceived.
Some cases use more words than others to outline the essential elements of fraud and deceit. Each case of the kind must be decided upon its own facts. Messina v. Greubel, 358 Mo. 439, 215 S.W.2d 456. And see Lowther v. Hays, Mo.Supp., 225 S.W.2d 708; Bertram v. Kempster, Mo.Sup., 216 S.W.2d 494; Nash v. Normandy State Bank, Mo.Sup., 201 S.W.2d 299; Jeck v. O'Meara, 343 Mo. 559, 122 S.W.2d 897. In the Lowther case [225 S.W.2d at page 713] this court quoted 37 C.J.S., Fraud, § 3, page 215, as follows, "Comprehensively stated, the elements of actionable fraud consist of: (1) A representation. (2) Its falsity. (3) Its materiality. (4) The speaker's knowledge of its falsity or ignorance of its truth. (5) His intent that it should be acted on by the person and in the manner reasonably contemplated. (6) The hearer's ignorance of its falsity. (7) His reliance on its truth. (8) His right to rely thereon." In the instant case we are especially concerned with the element "(8)" of the quoted statement from Corpus Juris Secundum.
March 8th plaintiff, who had become ill while visiting her parents in Howell County, was being transported to Springfield in the Robertson ambulance. The ambulance and the automobile of defendant Patterson collided, as stated. After the collision plaintiff was taken to the Burge Hospital at Springfield. She was under the care of Dr. Arthur D. Knabb. Plaintiff remained in the Burge Hospital for fifteen days. According to the records of the hospital, a radiological examination of plaintiff by X-ray, as of March 20th, disclosed there was "a non-bony union of posterior elements of 5th lumbar vertebrae, characteristic of spondylolisthesis 1st degree."
At the time of the alleged fraud, defendants Page and Dorothy Robertson were represented by A. P. Stone, Jr., an attorney of Springfield; and defendant Albert L. Patterson, Jr., was represented by A. Ronald Stewart, an attorney also of Springfield.
About a week after the casualty and while plaintiff was yet in the hospital, her husband and one Paul Sifford, a brother-in-law, called on the attorney A. P. Stone, Jr., at his office. By deposition, plaintiff's husband testified of this first interview as follows, "we just walked in, Paul Sifford knew you (Mr. Stone), and he introduced me to you, and we sat down and talked a little while, and you asked me how my wife was getting along, and then you said, well, it wouldn't be no fault of the ambulance, and you said that you knew the attorney that represented Patterson and you would introduce Mr. Sifford and I to him, which you did; we just talked a minute or so, and there wasn't much said, then you said there wouldn't be any need of employing an attorney, you said, `Just wait until your wife gets out of the hospital and have Dr. Knabb to send me a copy of her illness, her injuries', you said, `and I'm sure that Mr. Stewart will be more than fair and do the right thing by your people.'" The attorney Stone also requested plaintiff's husband to return to the office when plaintiff's doctor had made a report of plaintiff's physical condition.
April 22d, plaintiff and her husband came to Mr. Stone's office. They had Dr. Kanbb's report of plaintiff's injuries. In his report, dated April 21st, Dr. Knabb said plaintiff's injuries were "apparently not of a serious nature and consisted of severe bruises on each hip and abrasions on the knees. X-rays taken of the pelvis and the spine did not show any evidence of bone injury. The patient made considerable complaint of pain in the lower back. I considered that she probably received a strain of the back, and she received heat treatments while in the hospital. Since leaving the hospital she has had a number *83 of diathermy treatments at my office. The patient complains much of pain in the lower back and states that she is able to be about or use herself only with pain and difficulty. It is my impression that Mrs. Wood's injuries are not serious or permanent in nature." Plaintiff's husband testified of this second interview as follows, "Well, you (Mr. Stone) took and looked at the (Dr. Knabb) report and made a remark of some kind like well, she is bruised up a little bit and says it doesn't sound like anything serious in the report that Dr. Knabb wrote, and was I ready to make a settlement, and I told you before I made any kind of a settlement I would like to have her examined by some specialist, and you said that would be all right with you, and you suggested Dr. Yancey and asked me if I would give you the okay to examine the files over at Burge Hospital, which I did. You called up and made the appointment with Dr. Yancey and told me that you would call me in the near future." Plaintiff testified that Mr. Stone said "he would find out what Dr. Yancey found out was wrong with me if anything."
Following this second interview Mr. Stone notified plaintiff of the date of an appointment with Dr. Yancey for a physical examination of plaintiff, and plaintiff, April 23d, accordingly reported to Dr. Yancey's office. Immediately after the examination, plaintiff had a conversation with Dr. Yancey "about what his findings were on his report." Dr. Yancey said "he would send it to Mr. Stone and Mr. Stone could tell me about it and the doctor also said he wanted to see me again. * * * He told me he wanted to see me again. I asked him when and he said he would let Mr. Stone know, that Mr. Stone would tell me when he wanted me to come up again."
Dr. Yancey later reported to Mr. Stone the results of the doctor's examination, which report, as of April 23d, was as follows, "This lady is very nervous and apprehensive. She appears to me to have developed a very definite neurosis. A satisfactory examination could not be done. * * *" X-rays reveal "mild curvature of the lumbar region of the spine to the left * * * considerable increase of the lumbo sacral angle with mild spondylolisthesis (forward displacement of a lumbar vertebra, especially on the sacrum, Webster's New International Dictionary, 2d Ed., p. 2434). The upper lumbar bodies are in good alignment. Normal intervertebral spaces. * * * Due to the fact that I was unable to conduct any type of satisfactory examination, I would suggest that Mrs. Wood be returned for further studies after she overcomes her extreme nervousness and anxiety following a month or so of rest. I also would recommend that a psychiatric evaluation be obtained from a competent psychiatrist. * * *"
The morning of May 1st, plaintiff's husband again went to Mr. Stone's office. The husband testified Mr. Stone had called him on the telephone and had expressed the desire to talk with him alone. Mr. Stone had theretofore received Dr. Yancey's report. Plaintiff's husband testified, "when I come up to your (Mr. Stone's) office I asked you if you had got in touch with Dr. Yancey and you said you had, and I asked you what was said, and you told me that he said practically the same thing as Dr. Knabb, and I went ahead to tell you that he didn't explain to my wife what her condition was and that he said he would let you know her conditions. And you asked me about what I had spent and you took it down in figures and I said, `Well, I don't still yet feel satisfied', and you said, `You got two doctors' words for it, that there is nothing wrong with her except extreme nervousness'; you said, `Your wife is awful nervous'; you said, `After you settle this case she will probably start feeling all right, (after) this case she will probably start feeling all right, this has got her upset and worried.'" (Our emphasis.) During this interview plaintiff's husband withdrew to an adjacent room and talked by telephone with Dr. Knabb.
There was evidence introduced by defendants tending to show that Mr. Stone had shown Dr. Yancey's report to plaintiff's husband; that plaintiff's husband, Mr. Stone and Mr. Stewart had "gone over" the report; and that, because of the reference to "neurosis," the husband had said he didn't think it would be a good idea to *84 show the report to his wife. The husband denied having seen the report. Plaintiff's husband said he agreed to take the $675 on that third occasion "unknownst of her injuries * * * Dr. Yancey told you (Mr. Stone), and he didn't tell my wife, so you was the only one's word I had to take for it."
After the interview the morning of May 1st the plaintiff's husband left Mr. Stone's office and presently returned with plaintiff. Mr. Stewart was also present. Plaintiff testified, "When we got to Mr. Stone's office and he (Mr. Stone) gave us these releases and when we went to sign them I said, `that is against my will'. I realized what they were, I said, `that is against my will, I don't want to sign these', and my husband told me then, he said, `you go ahead and sign them, I believe it is for the best, that Mr. Stone assured me there is nothing wrong with you except nervousness', said Mr. Stone told him, `you have the two Doctors words and there is nothing wrong with your wife but nervousness.' He (plaintiff's husband) said, `you go ahead and sign them', and I think I said a second time, `it is against my will and I don't want to do it.'" (Our emphasis.)
It was the testimony of Doctors Knabb and Yancey that plaintiff's spondylolisthesis was congenitalwas not caused by trauma. However, it is plaintiff's view there was substantial evidence introduced tending to show that the condition of plaintiff's spine was caused or aggravated by the trauma experienced in the vehicular collision. And, June 3, 1948, plaintiff was operated on by Dr. James D. Horton who effected a grafted bone fusion to stabilize her spine. Following the operation, she was confined in the hospital for eighty-four days; and now (at the time of trial) complains of pain in her back, wears a brace for support, and walks with a cane.
Where the issue of fraud involves the element of the right to rely on the alleged fraud-feasor's representation, it is misleading to say the evidence must show fraud plus absence of negligence; and it is a misnomer to use the word "negligence" in this connection, if it is understood as carrying its usual signification, because "the law of fraud does not exact of the victim that degree of caution which some other hypothetically prudent person would have used, but only reasonable care in view of his situation." State ex rel. Union Pac. R. Co. v. Bland, 324 Mo. 601, 23 S.W.2d 1029, 1032; Messina v. Greubel, supra; Bertram v. Kempster, supra. It has been written that, in treating with release cases, this court has gone a long way to protect the foolishly credulous, as consonant with the administration of pure justice; but the courts will not protect those who, with full opportunity to do so, will not protect themselves. And where the means of knowledge are at hand and are equally available to both parties and the subject matter is alike open to their investigation, if one of them does not avail himself of those means and opportunities he will not be heard to say that he was deceived by the other party's misrepresentation, if there be no confidential relationship between the parties and if no fraudulent devices have been practiced upon the one alleged to have been defrauded to induce him to refrain from making an inquiry, or to anesthetize his sense of caution. Conklin v. Missouri Pac. R. Co., 331 Mo. 734, 55 S.W.2d 306; State ex rel. Union Pac. R. Co. v. Bland, supra; Poe v. Illinois Central R. Co., 339 Mo. 1025, 99 S.W.2d 82; Rau v. Robertson, Mo.Sup., 260 S.W. 751. But the contrary is true where the alleged fraud-feasor fraudulently induces his adversary to refrain from inquiry as where the fraud-feasor has, or by calculation and artifice obtains, the confidence of the other and causes him to forgo the exercise of caution. Conklin v. Missouri Pac. R. Co., supra; State ex rel. Union Pac. R. Co. v. Bland, supra; Rau v. Robertson, supra.
If credence were to be given to the plaintiff's evidence that the attorney Stone had made the statements, actual and tacit, to the effect that two doctors, including Dr. Yancey, had said there was nothing wrong with plaintiff but nervousness, then it would follow that the statements were false. The attorney had at hand Dr. Yancey's report stating the condition of plaintiff's lower spine. Defendants introduced evidence *85 tending to show the Dr. Yancey report had been shown to plaintiff's husband, but the husband denied he had seen the report. We fully appreciate our duty here to accept plaintiff's evidence as true and to disregard defendants' evidence except as it may aid plaintiff's case. In ruling this point we must assume the attorney made the statements, and we must assume that neither plaintiff nor her husband had seen Dr. Yancey's report.
Since neither plaintiff nor her husband had seen Dr. Yancey's report, what would have been the natural thing for plaintiff or her husband to do in the exercise of even the slightest degree of caution? Merely to ask to see the report which was there in the hands of Stone. Or if it could be said the evidence does not show that either plaintiff or her husband knew Dr. Yancey had made a written report and if it be assumed plaintiff and her husband thought Dr. Yancey had made a verbal report to Stone, what would have prevented plaintiff or her husband from inquiring of Dr. Yancey if he had told Stone there is nothing wrong with plaintiff except nervousness? See again and compare Conklin v. Missouri Pac. R. Co., supra. Now if plaintiff or her husband had taken the precaution to ask Dr. Yancey concerning the wife's physical condition, and if the doctor had said there was nothing wrong with the wife but nervousness, we do not here say plaintiff would or would not have had the right to rely on the doctor's representations. However, it has been held that, in circumstances shown in evidence in various cases, the various plaintiffs were entitled to rely on the statements (relating to the nature and extent of plaintiffs' injuries) made by physicians employed by the various defendants to treat or examine plaintiffs. See State ex rel. Missouri Pac. R. Co. v. Trimble, 332 Mo. 962, 59 S.W.2d 622; Atchison v. Missouri Pac. R. Co., Mo.App., 46 S.W.2d 230; Felchlin v. Kiel, Mo.App., 160 S.W.2d 463, cited by plaintiff-appellant. See also Prince v. Kansas City Southern Ry. Co., 360 Mo. 580, 229 S.W.2d 568; Macklin v. Fogel Const. Co., 326 Mo. 38, 31 S.W.2d 14; Tattershall v. Yellow Cab Co., 225 Mo.App. 611, 37 S.W.2d 659; Yeager v. St. Joseph Lead Co., 223 Mo.App. 245, 12 S.W.2d 520.
Here we have no evidence of a confidential relationship, and there is no evidence of artifice whereby plaintiff (or her husband who seems to have been acting with her in the settlement of their claims) was induced to forgo an independent investigation of the facts. The sources of Stone's and Stewart's information concerning plaintiff's physical condition were quite as available to plaintiff's husband and to plaintiff. The knowledge of plaintiff's physical condition did not peculiarly repose in Stone and Stewart.
We bear in mind that plaintiff had testified Dr. Yancey had told plaintiff (immediately after the physical examination when she asked "what his findings were on his report") that she could learn from Stone the result of the examination, and that he (Dr. Yancey) wanted to see plaintiff again. As the doctor, witness for plaintiff, testified, the report had not then been prepared, and the fact that Dr. Yancey said Stone could tell plaintiff "about it" did not prevent plaintiff or her husband from asking to sec the report or from asking for a copy of the report when it was completed, nor did it prevent them from asking the doctor, before they executed the releases, if he had said in the report or verbally to Stone that nothing was wrong with plaintiff but nervousness. Dr. Yancey's statement to plaintiff that he wished to again see plaintiff would tend to indicate to her and to her husband that Dr. Yancey was not satisfied with his one examination of plaintiff. It is true Stone did not subsequently (and prior to the execution of the releases) arrange for a further engagement for Dr. Yancey to examine plaintiff. Obviously, plaintiff and her husband knew Stone had not again arranged for Dr. Yancey to see plaintiff. We have noted plaintiff's husband testified that, while he was at Stone's office on the morning of May 1st, he withdrew and telephoned plaintiff's physician, Dr. Knabb. We have also noticed that the Burge Hospital records as early as March 20th had disclosed the "non-bony union" of plaintiff's vertebrae, and spondylolisthesis, first class. Although he testified he authorized *86 Stone to examine the hospital records, the husband testified he made no effort to examine such records; and he made no effort to call or to see Dr. Yancey. There was nothing shown in evidence which would have deterred or discouraged plaintiff or her husband from asking plaintiff's own physician what the hospital records disclosed; or which would have deterred either of them from making an inquiry of the two physicians, which inquiry would no doubt have fully disclosed the facts which plaintiff now says were misrepresented.
It is our view the evidence, considered from a standpoint favorable to plaintiff, was insufficient in tending to establish that plaintiff had a right to rely on the alleged fraudulent representations. Conklin v. Missouri Pac. R. Co., supra.
The judgment should be affirmed.
It is so ordered.
LOZIER, and COIL, CC., concur.
PER CURIAM.
The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court. All of the Judges concur.