Robert A. HEREFORD et al., Plaintiffs-Respondents,

v.

The UNKNOWN HEIRS, etc., of Adelle THOLOZAN, Deceased, et al., Defendants-Respondents,

Fred W. Sanguinet et al., Defendants-Appellants,

Locust Realty Company et al., Defendants-Respondents,

Reubin Sanguinet et al., Intervenors-Respondents.

No. 46518.

Supreme Court of Missouri, Division No. 1.

July 14, 1958.

See, also, Mo.App., 306 S.W.2d 648.

Joseph A. Kirkwood, St. Louis, for appellants.

Henry Ebenhoh, Walter S. Berkman, St. Louis, for respondent, St. Louis Title & Abstract Co.

Thompson, Mitchell, Thompson & Douglas, Charles M. Spence, Richard P. Conerly, St. Louis, for respondents Locust Realty Co. and Frank's, Inc.

COIL, Commissioner.

In 1950 plaintiffs below instituted an action for the construction of the will of Adelle Tholozan and for other relief. Count 1 (the will construction count) was separately tried and the final appealable judgment therein rendered was affirmed by this court on July 9, 1956. It was adjudged that Item Fourth gave Eulalie Phillips, who was the only daughter of Adelle Phillips and who survived the testatrix, a fee simple title in the "balance & remainder" of the property mentioned therein. Hereford v. Unknown Heirs, etc., 365 Mo. 1048, 292 S.W.2d 289, 291.

Item Fourth of the Tholozan will was: "It is my will & desire, & I hereby give, grant, devise & bequeath all the balance & remainder of my property & estate of every nature & kind whatsoever unto Louis V. Bogy & William C. Jamison as joint tenants & Trustees, for the sole, separate & exclusive use, benefit & behoof of Adelle Philips my niece, during her natural life, and at & after her death, then for the sole, separate & exclusive use, benefit & behoof of Eulalie Philips only daughter of said Adelle Philips, & all other children of said Adelle Philips, if any should be born hereafter, share & share alike, & if the said Eulalie Philips & the other children of said Adelle Philips, if any there should be, shall die, without having married, or without issue living, then the said property as aforesaid, & such portion thereof as shall then be on hand, shall go to & vest in fee simple in the said Sisters and brother of said Adelle Tholozan & their legal representatives, according to law, the Statutes of descents and distribution."

Certain of the defendants in the Hereford case, supra, had filed a cross claim against other defendants and intervenors and, after this court's decision construing the will, cross claimants filed a second amended claim in three counts. It was tried separately and, pursuant to court order, a final appealable judgment rendered.

The instant case is cross claimants' appeal from a judgment denying them relief.

On September 1, 1888, Adelle Phillips and Eulalie Phillips executed a 99-year lease on property located at 819 Locust Street in St. Louis which was among the properties in the "balance & remainder" of Adelle Tholozan's estate referred to in Item Fourth of her will. Respondent Locust Realty Company, a corporation, was at trial time the owner of that lease. In 1947 Locust Realty leased 819 to respondent Frank's, Inc., and thereafter executed a deed of trust on 819 to secure a $30,000 indebtedness. That deed of trust and the principal note were thereafter acquired by respondent St. Louis Title and Abstract Company.

On May 29, 1944, Eulalie Phillips executed a quitclaim deed to respondent Locust Realty conveying 819 for a stated consideration of $100 and for an actual consideration of $11,000. That deed was recorded May 29, 1944, with documentary stamps attached worth $42.90. In count one cross claimants sought the reformation of that deed on the ground of mutual mistake; by count two they sought cancellation of that deed on the ground of fraud in its procurement; and by count three, the cancellation of the 99-year lease on the ground that it had been forfeited by reason of nonpayment of certain taxes.

Eulalie Phillips died March 19, 1950, at the age of 90. From 1930 and until after the instant events, Charles P. Hassett, a St. Louis lawyer, represented her. From 1930 to 1944 he acted as her attorney in three matters directly connected with or affected by the Tholozan will. One of the properties in the "balance & remainder" of the Tholozan estate was on Hebert Street in St. Louis. That property was condemned by the city and $1,600 awarded as damages. Mr. Hassett, for the specific purpose of determining what interest his client, Eulalie Phillips, took under the Adelle Tholozan will, went to a vice-president of a St. Louis title company who was a personal friend of his as well as a good friend of Miss Phillips, and there read and discussed the Tholozan will and what estate Eulalie had acquired under Item Fourth thereof. The vice-president was of the opinion that Eulalie took a life estate and not an estate in fee simple. Mr. Hassett concurred in that opinion and so advised Miss Phillips.

Property at 3536 Olive Street was also a parcel in the "balance & remainder" under Item Fourth. One of the tenants requested information with respect to purchasing it. Mr. Hassett reported the inquiry to Miss Phillips and advised her that he had again visited the title company and that he again had been advised as before, that she took a life estate under the will and thus had only a life estate in the Olive Street property.

Probably in the fall of 1943, Miss Phillips informed Mr. Hassett that Mr. Schwenker, who was secretary-treasurer of Locust Realty Company and who owned most of its stock, had called on her relative to purchasing 819 Locust and that she had referred him to Mr. Hassett. Within a few days Schwenker called at Hassett's office and stated that new elevators had been installed but that inasmuch as his company's revenue from 819 could not be increased until long-term improvements were made, he would be interested in purchasing. At that time Miss Phillips was receiving $75 a month under the 99-year lease and Locust Realty was receiving $750 a month rent from Frank's. Schwenker submitted a $5,000 offer which Mr. Hassett told him he would not even refer to Miss Phillips. Thereafter, negotiations or conversations occurred over a period of about eight months with Mr. Schwenker calling on Mr. Hassett at the latter's office on an average of about twice a month. It was finally agreed that Miss Phillips would execute a quitclaim deed for $10,000 plus a $1,000 attorney's fee for Mr. Hassett.

Mr. Schwenker, although in the courtroom at trial time, did not testify because he was non compos mentis. Mrs. Schwenker, who was and had been president of Locust Realty Company, did testify but she knew nothing of corporate actions or other facts touching the issues in the instant case. (Mrs. Schwenker and her son were the only persons having any interest in Locust Realty other than Mr. Schwenker.) It is apparent, therefore, that Mr. Hassett's testimony is decisively important and consequently we shall set forth much of it in question and answer form.

With reference to Mr. Hassett's first meeting with Schwenker eight months prior to the execution of the deed: "Q. At this first meeting with Mr. Schwenker, Mr. Hassett, was there any conversation about the interest Mrs. Phillips had in the property at 819 Locust Street? A. Yes, I told him her interest was a life estate, and he told me he knew that. Q. He said he knew that? A. He knew that."

Mr. Hassett testified that the final figure of $10,000 was based upon Miss Phillips' age which he thought was about 70. (She was, in fact, then about 84.) In any event, however, Mr. Hassett did mention her life expectancy as being 10 to 20 years, and in that connection testified: "Q. Now, when you mentioned this life expectancy of ten years or twenty years to Mr. Schwenker, did he make any response? A. Well, as I recall it, I went a little bit farther. I said, 'All right, and when she does die, you have to deal with the others'. He knew that. Q. He said he knew that? A. He knew that." It is not shown when the meeting took place at which the foregoing conversation occurred. It may also have been at the first meeting. Another conversation, set forth below, apparently referring to the same matter, probably occurred at the same meeting as the testimony last above noted:

"Q. Mr. Hassett, did Mr. Schwenker ever indicate to you that he was taking a chance in purchasing this property? A. Well, I wouldn't say specifically that he did, I know I advised him, and he said yes, he knew it. Q. That he was taking a chance? A. He would have, he told me the same thing twenty years from now with the heirs, not Miss Phillips', Mrs. Tholozan's."

With reference to what he did after he had agreed to submit the $10,000 offer to his client:

"A. I went out and submitted the offer. She wanted to know what I thought about it. I said I would recommend it on the basis since you know and I know—at least I thought I did—that you only have a life estate.

"Q. What did she say? A. She said she would take it. * * *

"A. She says, 'What do you think about it?' I said, 'I would sooner not give my opinion,' I said, 'How do you feel about it?' She says, 'Well, I think I will take it,' she says. 'I agree with you,' I said, 'you know you only have a life interest in the property,' she says, 'Yes, I know that for years,' and then she asks, 'Well, do you think it is reasonable,' I said, 'Yes, I do, for your interest.' She says, 'Well, I will take it.'"

Sometime later, Miss Phillips signed the deed in the presence of Mr. Hassett, a notary, and Mrs. Kenefick, her second cousin and confidante.

With respect to the interest Miss Phillips understood she conveyed by the deed:

"Q. Mr. Hassett, as an attorney, you realize, of course, in Miss Phillips signing a quit claim deed she was conveying away whatever interest she had, do you not? A. I had advised her to that effect.

"Q. And she knew at the time when she was signing the quit claim deed that she was conveying away whatever interest she had in the prop-

perty? A. As I recall, the night the deeds were signed, I read the deed to Miss Phillips, and I told her in the presence of the notary public to sign it if she wanted to sign it.

"Q. And she knew at that time she was conveying away whatever interest she had based upon your advice, did she not? A. Well, I would say yes."

Mr. Hassett held the deed at his home until the second day thereafter when he met Mr. Schwenker at a bank where the deed was delivered and the money paid (accordingly on May 26, 1944; however, according to the bank records the checks delivered in exchange for the deed were not issued until May 29).

As to the interest Mr. Schwenker was to receive by virtue of the quitclaim deed, Mr. Hassett testified, "Q. Mr. Hassett, did you ever discuss with Mr. Schwenker what interest he was getting under· the quit claim deed? A. Yes. Any interest she had, it should be a quit claim deed, nothing else."

With reference to his discussions with Mr. O'Connor at the Title Insurance Corporation, we note:

"Q. In your discussions with Mr. O'Connor concerning the property, concerning the will of Eulalie Phillips, did he tell you that he was simply expressing an opinion as to what Eulalie Phillips's interest was under the will of Adele Tholozan? A. You probably didn't know Mr. O'Connor, because he was a very positive Irishman, and he told me. I didn't tell him anything. He told me.

"Q. Well, as a lawyer—A. He had been a family friend for years, not only of Miss Phillips, and possibly her grandmother.

"Q. As a lawyer, did you ever form any opinion as to what interests Miss Phillips had in this property? A. Well, we often advise with or consult

authorities, and I told him that I was consulting authority, and his opinion was my opinion. I did not feel qualified, that is, to pass on it myself."

And as to his reliance on the advice of Mr. O'Connor, this answer to this question is important: "Q. In connection with this transaction, the advice you relied on was that given to you by Mr. O'Connor, was it not? A. Yes."

Mr. Hassett testified also that Mr. Schwenker did not tell him prior to delivery of the quitclaim deed that he had had the title run on 819 Locust, nor did Mr. Schwenker ever tell him that Miss Phillips might have more than a life interest in that property. Cross claimants offered to prove by Mr. Hassett that he would not have permitted Eulalie to sign the quitclaim had he known she had more than a life interest in the property, nor would he have delivered the deed had he so known, nor would he have delivered it had he known that $42.90 worth of documentary stamps were to be affixed.

Mrs. Kenefick, whose relationship to Miss Phillips has been mentioned, testified that she often discussed with Eulalie the properties forming the "remainder & balance" under the Adelle Tholozan will and that Miss Phillips many times, ever since the witness had been a little girl, stated that she had only a life interest in the property and that she had said with respect to the Locust Street property near the time of its sale that she was supposed to set a price based on her life expectancy.

The quitclaim deed was recorded on May 29, 1944, and immediately thereafter a deed of trust, dated May 25, 1944, in the principal amount of $45,000, executed by Locust Realty on 819 Locust, was recorded. On May 29, 1944, a bank loaned Locust Realty $18,000 with the $45,000 deed of trust as collateral. The $18,000 was disbursed by three treasurer's checks to Locust Realty in amounts of $10,000, $1,000, and $6,060, and the balance of $940 went into a checking account which Locust Realty opened on that

date. The $6,060 check went back to the bank in payment of prior loans and the $10,000 and $1,000 checks were delivered to Mr. Hassett as noted above.

There was evidence adduced by cross claimants that in the opinion of an appraiser the May 1944 value of the leasehold (the lease was to expire in 1987) was $15,791.40 and the May 1944 value of the reversion was $9,458.60, a total of $25,250.

On June 25, 1940, Mr. D'Arcy, a lawyer whose connection with Locust Realty or with the matters here in issue was not specifically shown, ordered a new certificate of title for 819 Locust from Title Insurance. Mr. O'Connor, in a letter to the company's general counsel on June 26, 1940, stated, "the title is owned by Adelle Tholozan, deceased, and passed to the beneficiaries under a very peculiar devise * * *." Counsel answered that there were difficult and complex questions with respect to the will and suggested that the company should not certify the title "as being vested in any certain person until and unless the matter has been determined by litigation in which all possible interested persons are parties." There were notations on various papers in the Title Insurance Corporation's file, one under date of August 18, 1932, warning that care should be exercised with reference to any title certification based upon the Tholozan will.

The Land Title Insurance Company of St. Louis had issued various certificates of title on 819 Locust with respect to the leasehold. On May 22, 1944, or shortly thereafter (the representative of that title company did not know the exact date of delivery), a certificate of title was issued to Mr. Schwenker certifying that the fee simple title to 819 Locust was vested in Eulalie Phillips. On May 29, 1944, the title certificate was brought to date evidencing the quitclaim deed from Eulalie to Locust.

On January 24, 1941, in answer to an inquiry sent by Mr. Bloch, title examiner for Land Title Insurance, that company's general counsel advised that Item Fourth of the Tholozan will gave Eulalie a fee simple title to the property making up the remainder and balance of testatrix's estate. The vice-president of Land Title Insurance testified in the instant case that opinions as to titles were requested from their counsel in those cases where there was a doubt in the mind of the examiner, and, further, that when a certificate stated that a title was vested in a certain person, such was an expression of the company's opinion.

As we have indicated, it was and is appellants' theory and contention that either the parties to the deed acted under a mutual mistake as to grantor's interest in 819 Locust, or the conveyance was obtained by fraud perpetrated by Mr. Schwenker upon the grantor.

As to mutual mistake. Cross claimants contend that the parties to the quitclaim understood that the grantor had a life interest only and dealt with each other on that basis; that the oral agreement for the conveyance was for the life interest of Eulalie Phillips rather than for whatever interest she had; and that whether the mutual mistake was one of fact or of law and fact or of law only, equity will relieve from the consequences of that mistake where manifest justice and equity require it.

■ Appellants have supplied an excellent brief containing the citations of authorities which they contend support their view as to the type of mistake here involved and as to the circumstances under which equity has and will relieve against such mistakes. See (cited by appellants): Griffith v. Townley, 69 Mo. 13; Shanklin v. Ward, 291 Mo. 1, 236 S.W. 64; 9 C.J., Cancellation of Instruments, § 22, p. 1169; but see also on such questions: Kleimann v. Gieselmann, 114 Mo. 437, 444-446, 21 S.W. 796; First Nat. Bank of Kansas City v. Schaake, 240 Mo.App. 217, 203 S.W.2d 611, 615 [3, 4]; Simmons v. Friday, 359 Mo. 812, 224 S.W.2d 90, 98 [17-20]. The view we take, however, makes it unnecessary

for us to discuss the cited cases or determine what principles of law they support. That is because, upon a review of all the evidence, we are of the opinion that cross claimants have failed to sustain their burden to adduce convincing evidence that there was in fact a mutual mistake which resulted in the execution of the quitclaim deed but that, on the contrary, the facts and circumstances shown in evidence are consonant with the theory that the parties recognized that they were dealing with and dealt with an uncertain and undetermined interest.

Cross claimants, to support their contention, say that it is clear that Miss Phillips thought she had a life estate because she had always said she had, and that Mr. Hassett, her attorney, thought she had a life estate; that it is also clear that the parties dealt on the basis of a life estate because the price to be paid was based upon Miss Phillips' life expectancy. More specifically, cross claimants rely upon the conversation between Schwenker and Hassett, heretofore set forth, in which Hassett said that he had told Schwenker that Miss Phillips had a life estate and that Schwenker had said he knew that, and the conversation in which Hassett told Schwenker that he, Schwenker, would have to deal with the others when Eulalie died and Schwenker said he also knew that. In construing those conversations, it is proper to take into account Mr. Hassett's further testimony in which he said that he had advised Schwenker that he, Schwenker, was taking a chance, and that Schwenker realized that he would have the same thing to go through with the Tholozan heirs at the death of Miss Phillips. When those three separately stated conversations are considered as a whole and in connection with all the circumstances in evidence, Mr. Hassett's testimony that Schwenker said in reply to Hassett's statement that Miss Phillips had a life estate, that he (Schwenker) knew it, is not necessarily subject to the construction cross claimants put on it, viz., that it constituted a positive assertion of Schwenker's independent belief. On the

contrary, at least one reasonable construction is that Hassett was warning Schwenker that Miss Phillips might have a life estate only and that consequently, if so, Schwenker would not, by the quitclaim deed, receive anything more than a life estate and should therefore recognize that he would need to deal with the holders of the fee simple title upon Eulalie's death. Thus, Schwenker's statement agreeing with Hassett that Eulalie had a life estate may as well have meant that he recognized the uncertainty of Miss Phillips' interest, as to have been a positive representation of a fixed belief that Eulalie had a life estate. It is difficult to imagine what "chance" Mr. Hassett advised Schwenker about unless it was the uncertain and undetermined interest he would receive by a quitclaim deed, for certainly none would doubt that Eulalie had at least a life estate.

Then there is the fact that the transaction was accomplished by a quitclaim deed. Such is highly significant and to us persuasive that there was no mutual intent to deal with and convey only a life estate by that deed. If the parties believed a life estate only was to be conveyed in any and all events, certainly Mr. Hassett, a lawyer, knew how to limit the conveyance to correspond to the intent of the parties, and it is reasonable to think that he would have done so. Furthermore, in that same connection, it will be recalled that Mr. Hassett said that Miss Phillips knew she was conveying whatever interest she had and further he had told Schwenker that by the quitclaim deed he (Schwenker) was getting any interest Miss Phillips had and that the transaction should be accomplished by a quitclaim deed and in no other manner.

In addition, and, as we see it, bearing directly upon the mistake issue, is the fact that Mr. Hassett conferred twice with the vice-president of a title company for the very purpose of getting an expert opinion as to what kind of an estate the fourth clause of the Tholozan will conveyed to Eulalie. Mr. Hassett said that he told Mr. O'Connor that he was consulting him as an authority and

that "his opinion was my opinion" because he, Hassett, did not feel qualified to pass on it himself, and that he did rely upon that advice of Mr. O'Connor in the instant transaction. At another place in the evidence Mr. Hassett said that his own opinion was perhaps not as strong as Mr. O'Connor's opinion, i. e., his own opinion that his client took a life estate rather than a fee under Item Fourth.

Under all the evidence it seems to us that the only reasonable conclusion is that Mr. Hassett as a lawyer must have recognized that there was a real question as to what kind of estate Miss Phillips had and must have known that his belief (and Miss Phillips' belief, who acted on his advice) that it was only a life estate, was an opinion based upon his own construction of the will and upon the opinions of others. Thus, as a lawyer, he knew that until the question posed by Item Fourth was authoritatively settled, the interest his client would convey by a quitclaim deed was an uncertain and undetermined one. And the record supports the conclusion that Mr. Schwenker also must have had legal advice and, if so, he was bound to have recognized the uncertainty of what estate Miss Phillips had received under the Tholozan will and thus that her quitclaim deed would convey an undetermined interest.

It appears to us therefore that the parties to the quitclaim fully recognized that they were dealing with an uncertain interest and realized that the "fact" of what estate Eulalie took under Item Fourth was not established.

■ "Where there is a mutual recognition of the uncertainty of a given fact there is no mistake however the fact may turn out to be, and no ground for equitable relief." 30 C.J.S. Equity § 47(1), p. 375.

■ We have discussed enough of the evidence to indicate the reason for our view that the evidence falls far short of measuring up to the kind of clear and convincing evidence upon which we should be justified in basing a finding of mutual mistake. Mutual mistake, "in order to justify granting the relief of reformation, must be established by clear and convincing evidence." Walters v. Tucker, Mo., 308 S.W.2d 673, 679 [7].

As noted, cross claimants also contend, alternatively, that the deed should be cancelled because the grantee perpetrated a fraud upon grantor. To support that contention, cross claimants again point to Miss Phillips' belief that she had only a life estate; to the fact that Mr. Schwenker received a certificate of title on or about May 22, 1944, in which the title company expressed the opinion that Miss Phillips had a fee in the instant property; and that Mr. Schwenker failed to disclose that he had or knew of such a certificate of title but, on the contrary, had theretofore said that he knew that Miss Phillips had a life estate. Cross claimants also point out that documentary stamps in an amount indicating a consideration of $39,000 were attached to the quitclaim deed by Mr. Schwenker after he had received it and they contend that the facts establish all the elements upon which fraud is dependent. Lowther v. Hayes, Mo., 225 S.W.2d 708, 713 [3-6].

More specifically, cross claimants say that Mr. Schwenker committed three types of fraud, viz., (1) Active concealment; that is, although he had no duty to speak, he did speak and act, and in so doing had the duty not to cover up or disguise the truth (Ash Grove Lime & Portland Cement Co. v. White, 361 Mo. 1111, 238 S.W.2d 368, 372 [4, 5]), and that, by words and overt acts, he did conceal his state of mind, a presently existing material fact, or at least fraudulently failed to correct Miss Phillips' belief that she had only a life estate after he had good reason to believe and did believe that she might have an estate in fee simple; (2) Failure to correct a delusion under which he knew Miss Phillips labored and which he in equity and good conscience had a duty to correct when he knew that she relied upon the nonexistence of the fact that she might have more than a

life estate; and (3) An affirmative misrepresentation of a material fact, viz., that he (Schwenker) knew Miss Phillips had a life estate and her reliance on the truth thereof.

■ Appellants have cited authorities supporting the various facets of their contention. Again, however, we need not review or discuss the cited cases because, as our statements heretofore have forecast, we have the view that the evidence does not justify a finding of fraud and, in any event, we are of the opinion that the evidence pointed to as supportive of the various theories of fraud is not the clear and convincing evidence necessary to so prove.

Most of what we have said pertaining to mutual mistake is equally applicable to indicate our view as to the fraud issue. Irrespective, however, of every other consideration, we should be unwilling to hold, upon examination of all the evidence and considering the reasonable inferences therefrom, that Mr. Hassett (and through him Miss Phillips) did rely or had any right to rely upon anything Schwenker said or did or failed to do or say, in determining to or in executing the quitclaim deed. We shall briefly illustrate our view. Miss Phillips was represented by a lawyer. He read the Tholozan will. He formed an opinion as to the estate conveyed by Item Fourth and, more important, he, as a lawyer, had to know that the language in Item Fourth was such that only an authoritative construction could definitely determine the nature and extent of his client's estate. He wisely consulted a title company to obtain the opinion of one of its officers. Now the title company consulted was no stranger to the Tholozan will. Its file relating thereto contained a notation as early as 1932 warning its representatives to proceed cautiously in construing Item Fourth. Later, after Mr. Hassett's second and apparently final consultation, Mr. O'Connor described Item Fourth as a "very peculiar devise" in asking general counsel for an opinion. Under those circumstances, we think the inference is compelled that

when Mr. Hassett discussed Item Fourth with Mr. O'Connor, while the latter may have had a firm opinion as to what the language meant, he must also have indicated that there was a real question about it. So that Mr. Hassett, as a lawyer, as well as from information supplied by Mr. O'Connor, must be held to have known that the estate Miss Phillips took under Item Fourth was an uncertain one and one that would remain undetermined until settled by litigation, irrespective of legal opinions either way on the subject.

It seems to us apparent, therefore, that Miss Phillips relied on Mr. Hassett and that he relied on his own opinion and conclusion reached after obtaining Mr. O'Connor's opinion on which he said he relied in the transaction and after engaging in or having an opportunity to engage in every line of research and investigation he chose to follow or which was open to him to follow; and that it is equally apparent that Hassett did not rely on anything Schwenker said either eight months prior to the deed's execution or at any other time, and that his client was not misled or induced to act by the failure of Schwenker to disclose to Mr. Hassett that he (Schwenker) had a certificate of title showing a fee title in Miss Phillips or by Schwenker's failure to inform Hassett that he, Schwenker, had the belief that Miss Phillips did or might have a fee rather than a life estate.

■■ It is true, as pointed out by appellants, that it was not necessary that Miss Phillips rely solely upon the statements and acts of Schwenker, but it was sufficient if Schwenker's alleged fraud was one of the factors inducing or influencing her action. Bedell v. Daugherty, 362 Mo. 598, 242 S.W. 2d 572, 575 [7]. In the instant case, however, we are unable to find any reliance on Schwenker sufficient to have measurably influenced Miss Phillips' action. We are satisfied, from a careful review of the evidence, that Miss Phillips acted solely on her own and Mr. Hassett's judgment in the action she took. Warren v. Richie, 128 Mo. 311, 30· S.W. 1023.

Furthermore, if by some chance Mr. Hassett, and through him Miss Phillips, did rely on anything Schwenker did or said or failed to do or say, and if such did measurably influence the action of his client, then we hold he, and through him his client, was not justified in so relying. It should be emphasized that all Schwenker could have had was an opinion, either his own or another's. And as we have heretofore noted, Mr. Hassett was a lawyer. He had investigated. He was charged with knowledge of the uncertainty of Miss Phillips' estate and of the fact that any statement concerning the extent of that estate was necessarily an opinion. There was no confidential relation between Mr. Hassett and Mr. Schwenker. The source of and means to acquire all the knowledge Schwenker could have had as to the matter in question were at hand and equally available to Mr. Hassett. No device was practiced by Schwenker which reasonably could be said to have induced Mr. Hassett to refrain from making further inquiry and investigation. We should not care to say under those circumstances that a lawyer, in determining whether his client has a life estate or a fee, may rely upon a proposed lay grantee's opinion as to the meaning of a will, or rely upon that grantee to disclose his opinion as to its meaning, or to disclose that he had obtained the opinion of another or what that opinion was or what his state of mind was as to the estate he believed Miss Phillips had. Wood v. Robertson, Mo., 245 S.W.2d 80, 84 [3–5].

Two of the essential elements of actionable fraud are reliance by the one claiming fraud on the truth of the representation and his right to rely thereon. Wood v. Robertson, supra, 245 S.W.2d 82 [1, 2]. And each of the essential elements must be proved as a prerequisite to relief. Lowther v. Hays, supra. In our view, the facts not only fall short of constituting convincing evidence of reliance or of a right to rely but, as noted, we are of the opinion that the evidence supports the conclusions that Miss Phillips did not rely upon any word or act of Schwenker and that she would not have been justified in so doing.

Our views with respect to the issues of mutual mistake and fraud make it unnecessary to consider appellants' further contentions that the deed of trust held by respondent St. Louis Title and Abstract Company, and the 99-year lease owned by respondent Locust Realty at the time it received the quitclaim deed, should be canceled.

Our review de novo of this equity case, in which we have weighed the evidence and have arrived at our own conclusions as to its weight, causes us to reach the same conclusion as that of the trial court, and the judgment is affirmed.

VAN OSDOL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by COIL C., is adopted as the opinion of the court.

All concur.