225 S.W.2d 708 (1950)
LOWTHER et al.
v.
HAYS et al.
No. 41241.
Supreme Court of Missouri, Division No. 1.
January 9, 1950.
*709 Terrell & Taylor, Charles W. Hess, Jr., Guy A. Magruder, Jr., Kansas City, for appellants.
Forest W. Hanna, Jerome Stone, Kansas City, for respondents.
DALTON, Judge.
Action to recover commissions earned and due under an exclusive sales agency contract. Defendants filed a counterclaim for damages in the sum of $33,592.21 on account of alleged fraudulent representations of plaintiffs. The cause was tried to the court without the aid of a jury. The court found the issues for plaintiffs on both the claim and counterclaim. Judgment was entered in plaintiffs' favor for $1300. Defendants have appealed.
Appellants in Kansas City were engaged in the manufacture of a wooden toy gun, known as "Ranger Automatic." Respondents operated a sales agency in St. Louis. On June 28, 1945, respondents were given an exclusive sales agency contract to sell this toy on certain commissions. At the trial, the parties stipulated that $1300 was due respondents for commissions earned and unpaid. Testimony was heard on appellants' counterclaim. Appellants contend the court erred in finding for respondents on the counterclaim.
The charge of fraudulent representations is based upon a letter dated, August 1, 1945, from respondents to appellants. Appellants alleged that this letter falsely stated the number of orders held by respondents for appellants' toy gun and that appellants relied thereon to their damage.
Appellants' evidence tended to show the formation of their partnership, the signing of a sales agency contract with respondents and the beginning of the manufacture of the toy gun to fill orders supplied by respondents. As between appellant Hays *710 and the respondents, this contract was only a modification and continuance of a prior contractual relationship existing since March 1945. Under this contract orders for a great number of toy guns had been obtained and filed with appellants, but few guns had been manufactured or shipped. Appellants reserved the right to sell to outside sources in the event appellants' production of guns exceeded the sales by respondents. Sales commissions were payable on the 15th of each month following the date of invoice on all accounts paid by that time. All orders that had been secured by respondents prior to June 28, 1945 were to be considered under the new contract.
On July 1, 1945, appellants had on hand orders for about 68,000 guns. Thereafter, cancellations and new orders came in, until some 70,000 unfilled orders were in appellants' hands. On August 1, 1945, respondents wrote appellants the letter on which this suit is based. From this letter, appellants concluded that respondents had orders on hand for 100,000 guns, in addition to the orders which had been turned in to appellants. Production schedules to meet these orders were forthwith establised, raw materials were ordered, the pay roll was increased, machinery and facilities were added and appellants began to manufacture the toy guns as rapidly as possible. The rate of manufacture and shipment increased rapidly, until about the middle of October. Appellants shipped 948 guns in July, 7188 in August, 17,714 in September, 12,919 in October, 5485 in November, and 78 in December. A total of 44,331 guns were shipped, but cancellations totaled 63,540. Between August 1 and October 15 orders for some 33,612 guns had been cancelled and respondents had furnished new orders for only some 5000 additional guns. Appellants caught up with unfilled orders and, on October 18, respondents promised to get additional orders for 15,000 guns. Appellants continued in production until November 1, but new orders were not supplied. It was then too late for appellants to set up their own sales organization and appellants were left with 15,000 finished guns and some 30,000 others in various stages of production. There was no sale for these guns and large quantities had to be burned. Much material was on hand that could not be salvaged, or otherwise profitably disposed of, and appellants suffered damages in excess of $11,372, aside from the loss of profits and a sum in excess of $12,000.
Evidence favorable to respondents tended to show that orders for these toy guns were taken, beginning in March 1945; that, by August 1, orders for from 100,000 to 110,000 guns had been filed with appellants; that orders for 29,928 guns had been cancelled prior to August 1, largely because of the failure of appellant Hays and his various associates to manufacture and ship the guns within a reasonable time; that between August 1 and August 14 orders for some 17,000 guns were cancelled; that, thereafter, orders for some 16,000 were cancelled; that "quite a number," but not all of the cancellations between August 1 and August 14, and later, were due to appellants' failure to deliver; that a lot of advertising had "played up the war feature" and the saleability of the gun was adversely affected by the cessation of hostilities on "V.J. Day" (August 14, 1945); that saleability was also affected because the guns were made of wood and buyers did not want wooden guns on their shelves in 1946, when better guns made of metal and plastic would be available; that jobbers and wholesalers had to have such toys on hand by October 1 for delivery to retailers for Christmas sales; that respondents continuously pressed appellants to manufacture and ship guns; that appellants never caught up with available orders in their possession, until after the middle of October; that promptly after August 1, and, thereafter, from time to time, respondents furnished to appellants additional orders for 5000 guns; that appellants were never a solvent concern, except during the month of September 1945; that respondents continuously pressed appellants for the payment of commissions due and were unable to collect any commissions, until October 27, 1945, and then only for the amount due from April to October 1, 1945; that respondents were further asked "to hold the check awhile" because the money wasn't in the bank; *711 that, late in October, respondent tried to collect their commissions in toy guns, but appellants were of the opinion their own sales organization would sell the guns on hand and refused to settle on that basis; that respondents' salesmen lost interest because the customers were not getting deliveries and the salesmen were not getting their commissions; that, when respondents pressed for the collection of commissions they only got promises; that respondents visited appellants' plant "a good many times" in October and December 1945 and, at no time prior to February 11, 1946, was there ever a claim that respondents had misrepresented the number of orders on hand on August 1, nor was there any demand for such additional orders as respondents should have claimed to have had on hand on August first; and that no reference to the letter of August 1st was ever made during the time respondents were pressing for the collection of the past due commissions.
Documentary evidence included the sales agency contract of June 28, 1945 and subsequent correspondence between the parties, usually between appellant Hays and respondent Owens. On July 5, 1945, Owens wrote Hays: "Cancellations are coming in pretty regularly. I have a great many cancellations as well as a great many orders that I have been holding awaiting your word as to what would happen to Western Toy Company." On July 25, 1945, Owens wrote Hays as follows: "I have a great many more orders in my possession for Ranger Automatic Guns but have hesitated to send them on to you until you make some progress with the orders that we have had on hand for some time." On July 29, 1945 appellants wrote respondents, in part, as follows: "We have quite a number of guns in process now, which should be ready for continuous shipping beginning Monday or Tuesday. * * * My new partner, Mr. A. N. Ohlfest, called me from Detroit yesterday and said he had located a manufacturer there who wanted to manufacture the Ranger Automatic guns for us. This manufacturer wants a contract to make 500,000 guns for us within the next four months, stating he can produce them at the rate of 5,000 per day until December 1st. Do you think you can sell them this fast? * * * together with at least 3,000 per day to be made by us. If you think this is possible, please advise me at once and if we can get together on the price with this new manufacturer we will negotiate the deal. * * * Our production should be up to at least one thousand per day by the end of the coming week, and we expect to have this production up to 3,000 per day the latter part of August, possibly quicker. We have enough material on hand now for about 30,000 guns, and more coming in." (It is admitted that production never approached these optimistic estimates. A contract was subsequently made with a Detroit company, but it was cancelled before a single gun was produced.)
On August 1, 1945, Owens wrote to Hays, in reply to the letter of July 29, as follows: "If I understand your letter correctly, we should be shipping approximately 80 dozen guns per day by the end of this week. That production should undoubtedly step up as the month progresses until you reach the 3,000 per day which you say is possible by the latter part of August. I know that we both agree, and wish it were 3,000 pieces per day right now. * * * I have not made a recent tabulation of the guns that we still have on order but it is my opinion that it is still in the neighborhood of 70,000 pieces. Consequently with this quantity still to be delivered and the many orders that I now have in my possession, it looks as though it will take us at least 90 days to clean up our present orders. I note your comments regarding the connection made by your new partner, Mr. A. N. Ohlfest. Due to the lateness of the season and the fact that we have not made any deliveries, it is my opinion that it would be unwise to make a contract covering 500,000 guns, to be made within the next four months, and in addition to the 3,000 per day that you hope to produce. If a contract could be negotiated for approximately 250,000 guns, I would say o. k. provided they can start giving us deliveries on September 1st. I believe the *712 quantity of 250,000 can easily be disposed of, but I could not be inclined to advise you to go beyond that quantity." (Italics ours).
On the following day, August 2, 1945, respondents wrote appellants giving lists of cancellations, and stated: "Enclosed are some orders." On August 26, 1945, appellants wrote respondents, in part, as follows: "We are shipping over 1,000 guns per day now and expect to have this quantity doubled by the end of the coming week. Production will also be steadily increased thereafter. * * * If you have any more orders that you are holding up suggest that you send them to us at once as it will not be long until all orders now on hand will be completed. This will also help us in deciding what orders we will ship from our Detroit factory." (Italics ours). On August 31, 1945, respondent Owens acknowledged the receipt of the letter of August 26 and sent a number of orders and cancellations, and added: "Let me hear from you immediately regarding our method of paying commission to the salesmen. They will expect a commission check on the 10th of September for merchandise shipped thus far. Let's give this some serious and immediate attention."
On September 3, 1945, appellants sent respondent Owens an air mail letter in part as follows: "We will be needing more orders by Sept. 15th as our production is now running along at a good pace and our factory in Detroit will be in production in a few days. * * * We will have 60,000 guns out this month in K.C. alone, plus whatever Detroit can make. We have made no sales efforts whatever, leaving that all up to you, so you see we will soon be out of orders, unless new ones come in at a fast pace." (Only 17,714 guns were manufactured in September.) On September 18 appellants wrote all customers for a verification of their orders.
On October 18, 1945, appellants wrote respondents: "We are going ahead with the commission checks that are due * * * Our production has been coming along at 2,000 guns per day all this week and from all appearances will continue at this rate or better. According to our contract on the sales of the `Ranger Automatic' we are now at liberty to sell the guns through our own sales outlets, without paying of commissions or over-write, since our production has exceeded your sales. We still have one and one-half months yet this year for production and you can readily see we can produce quite a volume in that time at 2,000 per day, and naturally we are anxious to keep up our production. Before we make any commitments to take care of our production for the balance of this year, we would appreciate a word from you regarding your prospects for the immediate future regarding sales on this item that we may make our plans accordingly. We judged from Ben Owen's conversation this afternoon that he has no more orders on hand. We are now building up a backlog inventory on the guns, and as you know, we are not in a financial position to carry this for long. Will you please advise us concerning the above matter by return mail?"
Appellants continued the manufacture of guns until November 1, 1945, because (1) on October 18, Owens orally told Hays he could count on him for orders for 15,000 more guns; (2) appellants thought at that time they could organize a sales force and sell their own product; (3) appellants hated to lay off trained employees; (4) appellants believed that production could be continued until around December 1; and (5) appellants relied on retail dealers accepting guns until two weeks before Christmas.
On February 11, 1946, appellants' attorney advised respondents' attorney that respondents' claim for $1300 additional commissions was "subject to counterclaim for damages on account of failure to furnish orders pursuant to commitments."
Appellants contend that, in their letter of July 29, 1945, they set up a production schedule of 170,000 guns within 90 days from August 1, 1945; that, since respondents replied on August 1, "it looks as though it will take us at least 90 days to clear up our present orders," respondents represented, as a present existing fact, that respondents had on hand in St. Louis unfilled additional orders for 100,000 guns; that respondents "grossly misrepresented" the number of additional orders on file; that *713 the representation was false and was made with a knowledge of its falsity, or in reckless disregard of the truth, with the intent that it be acted upon by appellants; that respondents knew the appellant "would rely upon respondents' statements as to the number of orders on hand for the (respondents') product"; and that appellants were deceived by respondents' misrepresentation and acted upon the false representation to their damage.
Appellants particularly emphasize the words: "Consequently with this quantity (70,000 pieces) still to be delivered and the many orders that I now have in my possession, it looks as though it will take us at least 90 days to clean up our present orders" (parenthesis and italics ours). While appellants claim to have construed the letter as a representation that respondents then had in their possession orders for an additional 100,000 guns, they now state in their brief: "The only question is, how many did he say that he had?" Appellants insist that the judgment of the trial court should be reversed and a judgment entered in their favor for a minimum of $12,000. They insist that "the only real questions are whether or not a misrepresentation of a present, existing fact was made and whether or not it was effective or substantial factor in determining appellants' course of conduct." The trial court found both of these issues for the respondents. "All fact issues upon which no specific findings are made shall be deemed found in accordance with the result reached." Sec. 114(b), Laws 1943, p. 388; Mo.R.S.A. § 847.114(b).
The action is at law, but it was tried to the court without the aid of a jury and we must review it upon both the law and the evidence as in suits of an equitable nature. The judgment may not be set aside unless clearly erroneous, and due regard must be given to the opportunity of the trial court to judge of the credibility of the witnesses. Subsection (d), Sec. 114, Civil Code of Missouri, Laws 1943, p. 388, Mo.R.S.A. § 847.114(d).
The evidence properly took a wide range to show the relationship of the parties and the facts attending the sending of the letter upon which the counterclaim is based. Wagner v. Binder, Mo.Sup., 187 S.W. 1128, 1159; Rice v. Lammers, Mo. App., 65 S.W.2d 151, 154; Boyles v. Burnett, 213 Mo.App. 288, 249 S.W. 719, 721.
The elements and essentials of an action for fraud are not in dispute. The rule is stated in 37 C.J.S., Fraud, § 3, p. 215 as follows: "Comprehensively stated, the elements of actionable fraud consist of: (1) A representation. (2) Its falsity. (3) Its materiality. (4) The speaker's knowledge of its falsity or ignorance of its truth. (5) His intent that it should be acted on by the person and in the manner reasonably contemplated. (6) The hearer's ignorance of its falsity. (7) His reliance on its truth. (8) His right to rely thereon." And see Nash v. Normandy State Bank, Mo.Sup., 201 S.W.2d 299, 303 and cases cited; Jeck v. O'Meara, 343 Mo. 559, 122 S.W.2d 897, 902; Gockel v. Gockel, Mo. Sup., 66 S.W.2d 867, 870, 92 A.L.R. 784; 23 Am.Jur. 773, Fraud & Deceit, Sec. 20. The establishment of each of these essential elements is necessary to a recovery. Dillon v. Hill, Mo.Sup., 178 S.W. 85; Orlann v. Laederich, 338 Mo. 783, 92 S.W.2d 190, 194. "Fraud is never presumed, but must be proven. Yet it is not necessary that it be shown by direct evidence. It may be established by facts and circumstances, and the burden of proof rests upon him who asserts it to make it manifest." Hardwicke v. Hamilton, 121 Mo. 465, 473, 26 S.W. 342, 344; Orlann v. Laederich, supra. The difficulty of proving fraud, does not dispense with the necessity of making the proof. Ray County Savings Bank v. Hutton, 224 Mo. 42, 72, 123 S.W. 47. "And where the transaction under consideration may as well consist with honesty and fair dealing, as with a fraudulent purpose, it is to be referred to the better motive." Jones v. Nichols, 280 Mo. 653, 216 S.W. 962, 964; Moberly v. Watson, 340 Mo. 820, 102 S.W. 2d 886, 889.
We think the statements contained in the letter of August 1, amounted to no more than an expression of the opinion or conclusion of the writer. Appellants requested an opinion and the reply amounted *714 to no more than that. In a case such as this, appellants must show the misrepresentation of a present existing fact. The letter of August 1, was a statement of expectations and possibilities in the future. It was indefinite and uncertain, not specific. See definition of "many" in Goslin v. Kurn, 351 Mo. 395, 173 S.W.2d 79, 87. A careful reading of the letters of July 29, and August 1, in connection with other facts shown by this record, convinces us that the letter was written in good faith and was not intended as a factual statement of the number of orders on hand. Ray County Savings Bank v. Hutton, supra, 224 Mo. 42, 65, 72, 123 S.W. 47. Mere statements of opinion, expectations and predictions for the future are insufficient to authorize a recovery. Finke v. Boyer, 331 Mo. 1242, 56 S.W.2d 372, 375; Collins v. Lindsay, Mo. Sup., 25 S.W.2d 84, 90; Budd v. Budd, 233 Mo.App. 377, 122 S.W.2d 402, 408; National Theatre Supply Co. v. Rigney, Mo.App., 130 S.W.2d 258, 263.
On the issue of deception and reliance, we think the record shows that appellants were not deceived and did not rely or act upon respondents' letter of August 1; and that the damage and loss complained of was not due to any such deception or reliance. "Deception is the very essence of actionable fraud. A false representation of a material fact made for the purpose of deceiving is not sufficient; it must appear that it accomplished its purpose, that is, that it did in fact deceive. In other words, it must appear that the person to whom it was made was ignorant of its falsity and relied on its truth." Maupin v. Provident Life & Accident Ins. Co., Mo.App., 75 S.W.2d 593, 596. Appellants from time to time asked for and received new orders from respondents. There is not the least suggestion in the correspondence to indicate that appellants were deceived by the letter or relied on any statement therein. In determining the issue of fraud, "the question must be considered from conditions existing at the time of the transaction and not from conditions existing at a later date." A. B. Collins & Co. v. Quentin, Mo.App., 71 S.W.2d 758, 760. The record shows appellants' damages and losses were due to other causes and that the claim of false representation, reliance and damage was wholly "an after thought," arising subsequently as a defense to respondents' claim for unpaid commission. Appellant Hays admitted respondents' repeated demands for commissions and added: "For this over $1300 that we find we don't owe them." (Italics ours.)
The evidence concerning the consideration given to respondents' letter of August 1, that is, whether or not appellants believed the statements contained therein and relied thereon was largely oral. The trial judge saw the witnesses and heard their testimony and found for respondents. In addition, the correspondence between the parties refutes appellants' claim of reliance upon a false representation of respondents as to the number of additional orders on hand. If appellants believed that the letter of August 1 evidenced a representation of a present existing fact that respondents had on hand on that date orders for an additional 100,000 guns and, if appellants had believed and acted upon the representation, they would not have written respondents in the manner shown by the subsequent letters. No demand for the delivery of any such orders was made, nor was there any complaint of their nondelivery. There was no suggestion of deception, or reliance until months later.
A careful consideration of the whole record convinces us that the trial court reached a just and proper conclusion.
The judgment is affirmed.
All the Judges concur.