195 F.Supp. 867 (1961)
GENERAL AMERICAN LIFE INSURANCE COMPANY
v.
Edna Ruth Bullock COLE, Gertrude Christine Duerbeck, Joseph Neaf, Public Administrator in charge of Estate of James S. Bullock, deceased.
PRUDENTIAL INS. CO. OF AMERICA
v.
Joseph NEAF, Public Administrator in charge of Estate of James Stanley Bullock, deceased, and Edna Ruth Bullock Cole.
AID ASSOCIATION FOR LUTHERANS
v.
Edna Ruth Bullock COLE, Gertrude Christine Duerbeck, a/k/a Mrs. Gertrude (Houseknecht) Duerbeck, and Joseph Neaf, as Public Administrator in charge of the Estate of James Stanley Bullock, deceased.
Nos. 59 C 65(3), 59 C 80(3), 59 C 82(3).
United States District Court E. D. Missouri, E. D.
May 31, 1961.
*868 *869 Frank P. Aschemeyer and Paul G. Ochterbeck, St. Louis, Mo., for General American Life Ins. Co.
Mortimer A. Rosecan, St. Louis, Mo., for Edna Ruth Bullock Cole.
Raymond J. Lahey, St. Louis, Mo., for Gertrude Christine Duerbeck.
Thomas P. Howe, Neaf, pro se, St. Louis, Mo., for Joseph Neaf.
Paul B. Rava and John H. Lashly, Lashly, Lashly & Miller, St. Louis, Mo., for Prudential Ins. Co. of America.
Fred L. Kuhlmann and Stuart Symington, Jr., Stolar, Kuhlmann & Meredith, St. Louis, Mo., for Aid Assn. for Lutherans.
WEBER, District Judge.
Three causes of action were consolidated for trial, Cause No. 59 C 65 was instituted by General American Life Insurance Company, No. 59 C 80 by Prudential Insurance Company of America, and No. 59 C 82 by Aid Association for Lutherans. Each plaintiff had an insurance policy in force on the life of James Stanley Bullock, who was killed on December 17, 1958. The insurance companies each filed Bills of Interpleader tendering the proceeds of the policies in question into Court alleging that Edna Ruth Bullock (named beneficiary and wife of the deceased James Stanley Bullock), Gertrude Christine Duerbeck (aunt of James Stanley Bullock) and Joseph Neaf (Public Administrator of St. Louis County, Missouri, and administrator in charge of the estate of James Stanley Bullock) each claimed an interest therein.[1]
Edna Ruth Bullock was a resident of the State of Kansas at the time of the institution of the suits and Mrs. Duerbeck and Neaf were residents of Missouri and the companies invoked the provisions of 28 U.S.C., § 1335, which gives federal courts jurisdiction where two or more adverse claimants, of diverse citizenship, claim or may claim to be entitled to the proceeds of an insurance policy. The named defendants each filed their respective claims to the proceeds, the issues were thus joined and the cause came on to trial before the Court.
Edna Ruth Bullock, nee Ball, and James Stanley Bullock were married June 28, 1958, and had been married five months and nineteen days on the date he was killed. The short duration of the marriage, the mystery of his death and the amount of benefits provided by the policies of insurance on his life have been factual elements injected into the trial of the case as evidence from which certain inferences should be drawn.[2] All of the General American policies were obtained through the facilities of the employer of James Stanley Bullock; they were purchased before he met and married Edna Bullock; the beneficiary was changed from Mrs. Duerbeck to his wife *870 within one month after the marriage; and one group policy was increased from $6,000 to $8,000 about four months after the marriage. The Aid Association policy was issued over eight years before and the change of beneficiary took place within two months after the marriage. The Prudential policy was applied for in July, 1958, but not issued until September 19, 1958, due to some difficulty concerning James Bullock's medical examination, and Edna Bullock was the designated beneficiary from the date of its application and issuance. The policies contained provision for change of beneficiary at the discretion of the insured. Mrs. Duerbeck had no financial interest in the policies at the time she was beneficiary as she did not take them out upon the life of her nephew nor did she pay any premiums thereon.
Defendant Edna Ruth Bullock remarried on December 26, 1959, and is now Edna Ruth Cole but, for the convenience of this opinion, she will be referred to hereinafter as Edna Bullock. The deceased insured will hereinafter be referred to as James, the aunt as Duerbeck and the Public Administrator as Neaf. Other witnesses will be referred to by their last names.
Basically then, these are three suits in which three insurance companies deposit the proceeds of insurance policies on the life of James into Court and in which Edna Bullock, his legal wife, was the named beneficiary. She claims the proceeds as such. Duerbeck claims the proceeds in two of the cases on the grounds and under the theory that Edna Bullock fraudulently married James with the intention of collecting the proceeds of the policies. Neaf claims that Edna Bullock conspired in the death of James and is therefore barred from receiving the benefit of the policies by her own act, and that he, as Public Administrator, is entitled to the proceeds inasmuch as James died intestate.
At this point let the Court point out that this is not, nor has it been, a murder trial. The issue is not to determine guilt and punish for a crime as such proceedings are left to the state. This is a suit for insurance money and the sole legal issue here is whether the named beneficiary of the insurance policies is entitled to the proceeds or whether she is barred from receiving the proceeds because of fraud perpetrated on the insured or participation or complicity in his death.
There is no dispute in the evidence as to the fact that Edna Bullock and James were legally married and the marriage existed until its termination by his death. He met his demise outside the Art Museum in the City of St. Louis and death was the result of gunshot wounds of a type and description as to eliminate all possibility of self-infliction. In other words, he died by gunshot wounds inflicted by an assailant, but whether his death constitutes a murder or homicide within some degree recognized as a crime against the state, is, as yet, unestablished by criminal proceedings. The death officially remains a mystery, and whether the mystery will be solved to the satisfaction of the state criminal law is another mystery in itself.
The law involved in this cause is very simple. A person buying a life insurance policy may designate anyone he desires as a beneficiary. Walker v. General American Life Ins. Co., Mo., 141 S.W.2d 785, 787. Religiously, marriage is recognized as a divine institution and, in a sense, the law so recognizes it, but at the same time treats the relation as a matter of contract. Ryan v. Ryan, 156 Mo.App. 655, 137 S.W. 1014, 1016. Only the parties to a marriage have the right to complain of any injury therefrom or deceit in procurement and whether they marry and whether they continue to live together is for their decision alone. Hinkle v. Lovelace, 204 Mo. 208, 102 S.W. 1015, 1018, 11 L.R.A.,N.S., 730; 27A C.J.S. Divorce § 89, p. 311. A beneficiary under a life insurance policy which gives the insured the right to change the beneficiary has no vested interest in the policy and upon effective change by the insured is divested of all rights thereunder. Persons v. Prudential Ins. *871 Co., Mo., 233 S.W.2d 729, 732; Robinson v. New York Life Ins. Co., 168 Mo.App. 259, 153 S.W. 534; Morgan v. Penn Mut. Life Ins. Co., 8 Cir., 94 F.2d 129.
As to the Duerbeck claim, the lessons of the law are likewise simple. Her claim is based upon fraud. Fraud is never presumed but must be proven as an affirmative fact and if the facts shown consist as well with honesty as with fraud, the transaction should be held honest. Moberly v. Watson, 340 Mo. 820, 102 S.W.2d 886, 889. The burden is upon the party asserting the fraud and the proof must be clear and convincing. Farmers & Merchants Bank of Festus v. Funk, 338 Mo. 508, 92 S.W.2d 587, 589. And this is true even though the transaction was between husband and wife. Oetting v. Green, 350 Mo. 457, 166 S.W.2d 548. More than the mere weight or preponderance of the evidence is required and, while circumstantial evidence may be used, fraud may not be proven by building inference on inference. As said in the case of United States v. United States Cartridge Co., 95 F.Supp. 384, at loc. cit. 418:
"Fraud is never presumed but must be proved. Jones v. Simpson, 116 U.S. 609, 6 S.Ct. 538, 29 L.Ed. 742; Baumgartner v. United States, 8 Cir., 138 F.2d 29. The cases hold more than that the mere weight or preponderance of evidence is required. The evidence must be clear, unequivocal and convincing. * * While proof of fraud may be accomplished by circumstantial evidence, fraud may not be proved by building inference on inference."
The essential elements of actionable fraud are (1) a representation, (2) its falsity, (3) its materiality, (4) a perpetrator's knowledge of its falsity or ignorance of its truth, (5) the intent that it should be acted upon, (6) the ignorance of its falsity on the part of the person defrauded, (7) his reliance on its truth, and (8) his right to rely thereon. Lowther v. Hays, Mo., 225 S.W.2d 708, 713; Heckenkamp v. Kennedy, 8 Cir., 267 F.2d 887. And, the establishment of each essential element is necessary. Dillon v. Hill, Mo., 178 S.W. 85; Lowther v. Hays, supra; Heckenkamp v. Kennedy, supra.
It should be pointed out that the party to have been defrauded in this cause of action is not Duerbeck, but James. In other words, Duerbeck has no vested interest in the two policies in question and before she can recover has the burden of showing that Edna Bullock defrauded James.
As to the Neaf claim, the basic law is likewise not hard to understand. Edna Bullock was the legal wife of the deceased and the named beneficiary in the policies and, as such, she is entitled to the proceeds thereof. Moldovan v. John Hancock Mut. Life Ins. Co., Mo.App., 124 S.W.2d 541, 542. However, no one shall be permitted to found a claim on inequity nor acquire property by crime. Barnett v. Couey, 224 Mo.App. 913, 27 S.W.2d 757, 758. Therefore, if James died without a will, and he did, the proceeds of the policies of insurance in question could not go to Edna Bullock if she conspired or participated in his death. Hopkins v. Metropolitan Life Ins. Co., Mo.App., 151 S.W.2d 527.
Neaf's claim to the proceeds of the policies is based on the accusation that Edna Bullock committed or participated in the death of James. He alleges that she entered into a conspiracy with Dr. Glennon Engleman, her former husband, and with three others named Murphy, Lorts and Daly; that she instigated this conspiracy by making herself known to James, keeping company with him and subsequently marrying him; that she purposely failed to disclose her former marriage to Dr. Engleman, who was employed by the same employer as James and who was, in fact, his company dentist; that knowing she was the named beneficiary in several insurance policies and the co-owner of real estate she planned, aided and abetted in the murder of her husband.
*872 There is no question but that the burden of proof is upon him who asserts such a charge or claim. American Fire Ins. Co. v. Cinnamon, D.C., 100 F.Supp. 217; Fisher v. Miceli, Mo., 291 S.W.2d 845; Metropolitan Life Ins. Co. v. Banion, 10 Cir., 86 F.2d 886; Tippens v. Metropolitan Life Ins. Co., 5 Cir., 99 F.2d 671; Miele a/k/a Cusumano v. Boston Ins. Co., 8 Cir., 288 F.2d 178.
There is dispute between the parties as to the measure of proof. Edna Bullock contends the proof must be clear, cogent and convincing and Neaf that his burden is the preponderance of the evidence. This is a civil case and it is not necessary that proof of guilt be such as would be necessary to convict of a crime. Anything by way of legitimate inference from facts shown in evidence and which satisfies the mind and consciousness that the acts charged were perpetrated should be sufficient. Copeland v. American Cent. Ins. Co., 191 Mo.App. 435, 177 S.W. 820, 825. In Missouri, proof of a crime in connection with the collection of the proceeds of insurance is usually by the preponderance of the evidence. Copeland v. American Cent. Ins. Co., supra; Miele a/k/a Cusumano v. Boston Ins. Co., supra.
However, we have a situation here where Neaf is claiming the named beneficiary entered into a conspiracy with others, married the insured, failed to disclose a previous marriage, knew of insurance and then planned, aided and abetted in the murder of her husband to reap the financial rewards. Thus, we have an element of fraudulent intent in the commission or procurement of the serious offense of murder. In the case of American Fire Ins. Co. v. Cinnamon, supra, at loc. cit. 220, the insurance company was seeking to void the policy upon a charge of fraud by arson, and quoting from 6 C.J.S. Arson, § 38, p. 759, the Court said:
"a conviction may be had on circumstantial evidence, but the circumstances relied upon must be clearly and unequivocably proved, and be consistent with each other and with the hypothesis that accused is guilty, and inconsistent with the hypothesis that he is innocent and with every other rational hypothesis except that of guilt."
It would seem the better rule under the circumstances of the instant case that the burden of proof should be sustained by the preponderance of the evidence, yet, at the same time, as the charge here is in the nature of the positive crime of murder it should be clearly and unequivocally established. See American Fire Ins. Co. v. Cinnamon, supra, at loc. cit. 220 [7] 2. At least, the allegations and circumstances here require more than mere inference or suspicion.
From this review thus far it can be seen that this matter turns primarily upon issues of fact. This Court can, and must, decide only those issues which are before it and only upon the facts which have been presented during the trial. These facts can be ascertained only from the testimony offered and that testimony should be weighed and judged in the light of the conduct and appearance of the witnesses upon the stand, their opportunities to know and to be informed about matters upon which they gave testimony and the apparent reasonableness or unreasonableness of their testimony. A witness' statement in print may be entirely different from the conclusion reached as to the truth of that statement when the witness is observed and testimony weighed in the human crucible of experience and plausibility. Therefore, without regard to who the parties are, the Court shall review those facts which have not heretofore been set forth.
First, a review of the evidence offered by Duerbeck upon her claim which is bottomed upon fraud in the procurement of the marriage. This proof starts with evidence that Edna Bullock signed the application for marriage license as "Miss Edna Ruth Ball" and checked her marital status as "single". The burden of the rest of the Duerbeck testimony was to the general effect that Edna Bullock called James and made their first date sometime *873 prior to April 1, 1958; that none of James' friends or work associates knew that she had been previously married; that the preacher who married them did not know of any previous marriage and she was married "in white" in the sanctuary of a Lutheran church.
It was further shown that she had been previously married to Dr. Engleman, who was a dentist employed in his own private practice and also by James' employer; that James used the services of his company's dentist and when the dentist who had been treating him left the company, Dr. Engleman succeeded to his place; that he performed minor dental treatments, such as cleaning teeth and filling cavities.
The Duerbeck testimony further showed that Edna Bullock dated other men, including married men, prior to her marriage to James; that she told one of them (Johnson) not to see her any more because she was going to get married; that when he called on her on that occasion that she said, in effect, the man she was marrying was elderly, had only six months to live, was wealthy, and that's why she was marrying him. Edna Bullock was engaged to James at that time and her explanation of this was that she wanted to terminate her association with Johnson in view of her impending marriage and told him that as an excuse.
The Duerbeck testimony further showed that one Lavely, a writer of trade and magazine articles, had various dates with Edna Bullock prior to her marriage to James; that on one occasion in 1957, when they had been drinking, she had told him she had: "always had a plan to marry some rich old man, that she was going to bump him off or kill him or something, and get his money and live on it" and "her husband * * * a doctor of some sort * * * had access to some kind of pills and they were going to give this guy some pills and kill him that way." On cross-examination he admitted that was the only conversation of their's that he could remember out of approximately sixteen dates; that he could have suggested that she write short stories and this statement was in connection with that subject and that it was the theme of their conversation; that it was possible they were discussing plots of short stories; he stated that a year and a half later, when he read about James' death, he recalled this isolated conversation. Edna Bullock denied the conversation but admitted discussing story plots and the possibility of such a theme, with Lavely.
The Duerbeck testimony further showed that Edna Bullock was at home the night her husband was shot; that she was first told by officers that he had been in an accident; that she was questioned by police officers, later that night was told that her husband was dead and then questioned further; that two days later she was a witness at the coroner's inquest. Some discrepancy appeared in her statement thus made to the officials and her later testimony as to the name of the person from whom she obtained James' name prior to her first telephone call to him. This discrepancy alone, is insignificant, and the circumstances of her questioning, while not improper, could certainly be conducive to some error. Further, on examination and cross-examination of some of the Duerbeck witnesses it was revealed that Edna Bullock and James appeared happily married and there was no surface evidence of any marital rift, dissatisfactions or disaffection.
For the purposes of the Duerbeck claim the Court can make a determination at this point. This testimony, heretofore and hereinafter stated, fails to show any proof sufficient to constitute fraud. In the first place, a marriage is presumed to be harmonious and the continuation of the married status presumes condonation of prior immorality. It is as likely to assume from the evidence here that James knew of Edna Bullock's previous marriage as it is to assume that he did not know. She testified that he did know, although she said he did not know the name of her former husband and that he did not want to know it. Further, as it has been pointed out, Duerbeck had no *874 vested interest in any of the policies of insurance in question and James had the legal right to and did change the beneficiary. It is logical that a man upon becoming married would make his insurance payable to his wife.
There is no positive proof anywhere in this record that Edna Bullock ever made a false representation to James in order to cause him to marry her. Nor is there any testimony that James, ignorant of fraudulent representations, relied upon them. By all the standards essential to proof of actionable fraud, as set forth in Lowther v. Hays, supra, Heckenkamp v. Kennedy, supra, and Dillon v. Hill, supra, the Duerbeck claim must fail. The evidence is not clear, concise nor convincing. There is a legal question as to Duerbeck's right to challenge the change in beneficiary, but even so, her evidence falls far short of establishing the elements necessary to prove fraud.
Taking into account the evidence heretofore set forth, the Court will now review the evidence relating to the Neaf claim. Neaf's testimony showed, by additional witnesses, the fact friends and business associates of James did not know Edna Bullock had been previously married. It was further shown that Dr. Engleman had waited on James professionally nineteen times from 1956 to 1958; that he had two other Bullocks (brothers) as employee patients and on one occasion he asked one of them if they were related to each other and to James.
It was further shown that prior to the marriage, but after they were engaged, James and Edna Bullock went house-hunting; they paid earnest money of $2,000 on a two family apartment which they agreed to buy for $29,000; they executed a first deed of trust for $25,000 and a second deed of trust to the real estate broker for $2,000 for his commission; that Edna Bullock moved into the apartment ten days before the marriage, which was the termination date on the lease of the apartment in which she was then living.
The evidence further showed that the upstairs apartment of the building they purchased was rented for $125 per month; payments on the mortgages were $208 per month on the first and $50 per month on the second; that these payments included taxes, insurance, principal and interest. Edna Bullock earned $275.41 per month as a school teacher; James' salary was $408 per month (Exhibit 29), plus some assistance from the Veterans Administration for educational training. (This latter amount was not revealed by the evidence, but the Court takes judicial notice of the fact that it would approximate between $50 and $100 per month.)[3]
Neaf contends that certain unfavorable inferences should be drawn from the amount of the insurance involved, the changes of beneficiary, the purchase of the property, etc. The testimony here showed that the General American policies were obtained through group insurance provided by James' employer. This type of insurance carries a favorable rate. It was started at the beginning of his employment and increased from time to time before his marriage. It was likewise increased from $6,000 to $8,000 after his marriage. There is no evidence of any kind to indicate that the changes of beneficiary on those policies were accomplished in any manner other than by the express desire of James.
On the change of beneficiary on the Aid Association policy an agent named Boening called upon James in August 1958, after learning of his change of address. *875 He testified that this was a company service and he went to the house, learned of the marriage, suggested that James should change the beneficiary and tried to sell him additional insurance. (This was after the purchase but before issuance of the Prudential policy.) The agent further testified that Edna Bullock did not participate in any of his conversation with James and he could not even remember if she was around the premises; that the entire suggestion came from him (the agent) and he secured the signature to the application for change of beneficiary from James.
The testimony further showed that an agent for Prudential, one Tratner, in June or July of 1958 obtained the Bullock name from official record publications; that he went through this type of publication to determine recent marriages; that without knowing the parties he eventually called James on the phone and made a date for an interview. As he stated it, "I called cold". He said that Edna Bullock was present, but did not engage in any of the conversation; that he (the agent) went over James' financial situation, his purchase of property and explained the insurance plan his company had to offer and which he recommended; he left information and data with James and later called and obtained an application. He further testified that it was his recommendation for James to take a $10,000 basic policy; that it was his recommendation to add the $10,000 accidental death; that in view of the $25,000 mortgage on the property it was his suggestion to add a mortgage term reduction feature. There is no testimony that Edna Bullock participated in or suggested the purchase of this insurance and the agent's testimony was to the effect that his call on Bullock was entirely unsolicited by anyone.
When considering that $25,000 of the total insurance proceeds was a term mortgage reduction plan and $10,000 an accidental death benefit, the amount of insurance carried by James does not appear excessive; $17,000 of it was obtained before he ever married; after he married an old policy was increased $2,000 and he purchased the additional $10,000 from Prudential. The coverage of the mortgage by term insurance, which bears a low rate at his age, was suggested by the agent and the better part of wisdom. The accidental death provision was the suggestion of the agent. The purchase of a two-family apartment, where he could live in one and rent the other and thus obtain $125 per month toward retirement of the mortgages, was likewise the act of a prudent person and the better part of wisdom.
Therefore, it is the Court's opinion that the evidence concerning the insurance, the changes of beneficiary and the purchase of the property, could only fall in the status of an inference rather than any proof of a plan or conspiracy to effect the death of the insured. From this inference we can go to the remainder of the testimony and determine its weight and credibility. Actually the rest of Neaf's case boils down to the testimony of witnesses Deckard, Daly and Younglove.
Younglove was a building contractor. From 1940 to 1949 he was also employed as a civilian associate of the government to help conduct investigations on subversive activities. In 1957, he began calling on a lady friend who lived in the same twenty-four family apartment building where Edna Bullock resided before her marriage to James. Later in that year he moved in the apartment with his lady friend, whom he did not marry until 1959.
Younglove testified that he used the apartment during the afternoons to do the paper work connected with his contracting business; that in 1958 he was still apprehensive about his safety and would observe all new people visiting the apartment building; that he would sit at a table a few feet from a window and work on his papers; that whenever he heard people approaching the apartment building he would get up and look out the window and see if he could recognize them as anyone with whom he had contact while doing his undercover work; *876 when he ascertained they were no threat to his safety he did not bother about them further.
He further testified that in this manner he saw Dr. Engleman enter the apartment building not less than ten times in April or May of 1958; that he did not know Dr. Engleman but later, after James' death, when pictures were published in the newspaper he recognized his picture and recalled that he was the man whom he saw visiting the apartment. He also testified that a similar situation occurred with reference to Daly; that he saw Daly enter the apartment building on several occasions in April or May of 1958; that he did not know Daly but, after James was killed, saw his picture in the newspaper and then recognized him as the person whom he had seen entering the apartment building.
The testimony further showed that Edna Bullock lived in an apartment on the second floor over the apartment occupied by Younglove. The hallways of the building were terrazzo and persons going to the second floor would enter the front of the building a few feet from the window Younglove said he used; they would walk twenty-five or thirty feet down the hallway, go up to the second floor by an enclosed stairwell and then back down the upstairs' hall if going to the area of Edna Bullock's apartment. Younglove testified that he would listen to the footsteps as they would go back the hall, that they became inaudible at the stairwell and then became audible again in the hallway upstairs and that he could then hear the door open and close. The Court is being urged to infer that from this "delayed" identification and from the tracking of footsteps, Dr. Engleman and Daly visited Edna Bullock's apartment before she met and married James. The Court has viewed the pictures of the hall area and the window at which Younglove said he made his observations and has taken into account the shrubbery shown, the venetian blinds and the testimony as to Younglove's position in the room where he worked on the occasions when he was not out visiting his construction jobs. From all of this, it could be possible that Younglove heard and observed as he has testified, but it is not very plausible nor convincing. Neither does it particularly prove or disprove the allegation of Neaf's claim. It could only constitute another suspicion upon which an inference might be based.
Neaf's claim alleges that Edna Bullock entered into a conspiracy with Dr. Engleman, Daly, Murphy and Lorts. Murphy is a convict in the Illinois State Penitentiary and was brought here as a witness but refused to testify, claiming privilege under the Fifth Amendment; no inference can be drawn one way or the other from this occurrence. Lorts was an ex-convict who was killed in a gun battle with police while burglarizing a store in St. Louis; his partner in that crime was one Deckard, now a prisoner in the Missouri State Penitentiary. Daly, too, is now a convict in the Missouri Penitentiary and the parties had attempted to take his deposition and he refused to testify, claiming his privilege under the Fifth Amendment. However, when Daly was brought back and called to the stand by Neaf (who probably thought he would continue to refuse to testify) he then decided to testify and denied that he had entered into any conspiracy with Edna Bullock. Also, while here for this trial he entered a plea of guilty and was sentenced to the penitentiary on a federal charge.
The witness Deckard was likewise brought back from the penitentiary by Neaf, and while here he received three sentences to the federal penitentiary, one for escape from the custody of the federal marshal. The most part of Deckard's life has been spent in penitentiaries in Illinois, Pennsylvania, Indiana and Missouri, and for crimes ranging from armed robbery to arson. While a fugitive from federal custody he met, was hidden by, and entered into a series of crimes with Lorts. He said Lorts had told him he killed Bullock and Daly had told him he participated; that they all were a bunch of thieves and decided to go to Kansas City and shake down Edna *877 Bullock; that Daly took them to Kansas City and they met her on two occasions; that on the first occasion he demanded $5,000 to keep quiet and on the next day he raised the price to $10,000.
Further analysis of Deckard's testimony reveals a very hazy memory and description of the places in Kansas City where these contacts allegedly took place; in fact, he didn't even know if they were in Kansas City, Kansas, or Kansas City, Missouri; he didn't know whether they were in a business or residential district; he didn't know if they sat at a table or in a booth. He was cross-examined as to a description of the premises, later pictures of the premises were introduced into evidence, an owner was called and testified and from all of this it appears that Deckard's recollection was most hazy, if not fabricated.
Further, there was his testimony to the effect that while in jail in St. Louis County he sent for Edna Bullock's attorney with the idea in mind of still continuing his blackmail. He admitted that on this occasion he signed a written repudiation of his former statements and accusations made to officers, and then, in court he repudiated his repudiation and charged counsel with attempted blackmail. As occasion arose, Deckard seemed to rise to the occasion.
There was testimony to the effect that Deckard was apprehended with a gun which was later traced as having been purchased in Illinois by Daly. There is no doubt, from the testimony that Deckard and Daly had some association. The feeling of animosity of each toward the other was quite evident, in fact, took on the appearance of who could tell the most about the other. The Court had to caution Daly to make his answers responsive to the questions and at one point Deckard admitted he had been hired to kill Daly and was going to do it to get rid of a $4 personal debt and in hopes of a share in the loot of a burglary.
Under counsel's statement of surprise, the Court permitted Neaf great leeway in his examination of Daly. Under the circumstances the Court permitted full latitude of examination of both Daly and Deckard. If, however, the Court is called upon to believe the testimony of Neaf's witness Deckard, the Court would have to disbelieve the testimony of Neaf's witness Daly, and vice versa, for the testimony of each is exactly contrary to that of the other, and both were called by Neaf.
The Court saw and observed both of these witnesses. Their testimony, their actions upon the stand, their previous convictions, the discrepancies in the stories of each of them, does not make this the type of evidence upon which reliance can be placed. Neither of them is worthy of belief and neither of them is believed.
Other testimony was offered by Neaf to show Dr. Engleman's presence at Edna Bullock's apartment prior to the time of her marriage to James and the presence of her telephone number in the back of his appointment book. They were divorced in January of 1956 and she thereafter called on him for dental treatment and to collect alimony and admitted she sought advice from him and obtained some oral contraceptive pills after her marriage to James. There also was testimony that Dr. Engleman bought a twenty-two calibre pistol; his father-in-law testified he received it as a birthday present, that he kept it in his auto and it was stolen from his glove compartment in Muskogee, Oklahoma, in January, 1959; it was suggested by Neaf that as James was shot with a twenty-two calibre bullet it might be possible that this pistol got back into the possession of Dr. Engleman or others.
The testimony related in the preceding paragraph does nothing more than give rise to unconnected suspicions. The father-in-law and mother-in-law of Dr. Engleman testified the theft of the gun was reported to Oklahoma police and this was not refuted; to believe this gun was used by Lorts and somehow got back to the possession of the father-in-law, or that he made a false report, is to engage in the wildest of speculation, especially in view of the fact that even Deckard never intimated its connection with the *878 crime and no testimony places Dr. Engleman at or near the scene. The continued association with Dr. Engleman, after the divorce, while not exemplary, is nevertheless possible and plausible.
In summation of the Neaf claim, the testimony here reveals that outside of suspicions and inferences the claim hangs upon the testimony of Deckard. The evidence here falls far short of establishing a conspiracy to marry and take the life of James in order to collect insurance and obtain property of value. There is no proof of the presence of Edna Bullock at the scene or of physical participation in the killing, in fact, the opposite is true. Where the person accused is not present nor physically connected therewith the parties carrying the burden must show a conspiracy between the persons sought to be charged and the one actually committing the act. Macon v. State, 30 Ala.App. 276, 4 So.2d 439; People v. Ryan, 263 N.Y. 298, 189 N.E. 225. Here, the only proof is an inference that she could have had a reason to bring about the death of James, and absent Deckard, there is not only no proof of a conspiracy but no proof that the conspirators effected the killing in furtherance thereof.
The fact is, there is no proof in this record of any overt act of conspiracy. The most the Deckard testimony does is to show matters which occurred after the death of James. His testimony of statements by Lorts and Daly are hearsay as to them as well as to Edna Bullock; his testimony as to her statements does not even contain an admission and raises only an inference of guilty knowledge. The most that Neaf has shown is circumstantial evidence that leads to certain inferences and, basing inference on inference, lead but to suspicion. Even a strong suspicion of guilt is not sufficient in Missouri to support a conviction of crime. State v. Kinnamon, 314 Mo. 662, 285 S.W. 62, 63.
As said in United States v. United States Cartridge Co., supra [95 F.Supp. 418], "Fraud may not be proved by building inference on inference." And, circumstantial evidence, to be relied upon, must present circumstances consistent with each other and with guilt and inconsistent with any other reasonable hypothesis. Gurera v. United States, 8 Cir., 40 F.2d 338, 340; State v. Clark, Mo., 277 S.W.2d 593, 595. Evidence relied upon should lead to a definite and probable conclusion and that which raises only a suspicion of foul play and leaves the rest to surmise and conjecture is insufficient. Tippens v. Metropolitan Life Ins. Co., supra.
The Court has mainly considered the evidence thus far in the light of the claims of Duerbeck and Neaf. Edna Bullock took the witness stand and testified and gave explanation of some of the testimony they introduced. Some of her testimony reveals conduct on her part which probably does not meet all of the required, acceptable standards, but this is not a case to test her virtue or her morality. If her testimony is to be believed, the issues could be found for her over the testimony offered by the other two claimants. But, as their's is the burden of proof under the law, from that stand-point, her testimony need only be considered as it supports or maintains their burden.
Therefore, the matter comes down to the legal proposition of whether or not those who claim the proceeds of insurance policies in which Edna Bullock was named and designated as beneficiary have factually proven their case. Under all of the evidence offered, even when considered in the light most favorable to the Duerbeck and Neaf claims, this Court can reach no other conclusion but that they have failed to establish clear, cogent and concise evidence that a fraud was perpetrated upon James, or by the preponderance or greater weight of all the credible evidence that she entered into a conspiracy to kill him.
This opinion shall constitute the findings and conclusions of the Court and all suggested finding of fact and declarations of law, filed by the parties and inconsistent herewith, are specifically overruled. *879 An order shall be entered dismissing the Neaf and Duerbeck claims to the proceeds of the policies in question and sustaining the claim of the named beneficiary.
Thus endeth but "one chapter" in the mystery, for, murder does not bar by statute of limitations, § 541.190 Vernon's Annotated Mo. Statutes, 1949, V.A.M.S.; and, sometimes it doth out, Genesis 4:8-13. Only the money in the Registry of the Court is being disposed of, at this time and under these facts, and the writing of "future chapters" resigned to the passage of time.
NOTES
[1] Mrs. Duerbeck claims an interest only in the General American and Aid Association cases and Neaf claims an interest in all three cases.
[2] Aid Association: Policy No. 588424, $5,000.00, 4-1-50. Beneficiary changed from Duerbeck to Edna Bullock 8-1-58. Total: $5,000 plus surplus and interest of $112.01.

General American: Group Policy No. 8290, $500, 10-2-51; Increased to $1,000, 7-1-55; Beneficiary changed from Duerbeck to Edna Bullock, 7-14-58. Group Policy No. 8290, $4,000, 3-3-55; Increased to $5,000, 10-1-55; Increased to $6,000, 2-1-58; Increased to $8,000, 10-1-58; Beneficiary changed from Duerbeck to Edna Bullock, 7-14-58. Policy No. 1,192,841, $5,000, 10-16-55; Beneficiary changed from Duerbeck to Edna Bullock, 7-25-58. Total: $14,000 plus return premiums, dividends & interest of $624.22.
Prudential: Policy No. 31384713, $10,000, 9-19-58. (This policy had an accidental death clause for like amount.) (This policy also included a Decreasing Term Mortgage Loan Benefit for $25,000.) Total: $10,000 plus $10,000 accidental death plus $25,000 Mortgage Term to pay off real estate mortgage.
[3] Edna Bullock .............. $275.41
 James ..................... 408.00
 Rent ...................... 125.00
 _______
 $808.41
 V. A. Training ............ 50.00
 _______
 Total Income .............. $858.41 to $908 per month