The **MINNESOTA MUTUAL LIFE INSURANCE COMPANY**, a corporation, Plaintiff,

v.

**Mary JAMES, Georgia James, Paul Lean James and Mae Della Elizabeth James, and Perrin D. McElroy, Public Administrator of the Estate of Early James, Deceased, Defendants.**

No. 13063.

United States District Court
W. D. Missouri, W. D.

Feb. 1, 1962.

Lathrop, Righter, Gordon & Parker, Kansas City, Mo., for plaintiff.

R. B. Kirwan, Kansas City, Mo., for Mary James.

Pouncey & Wells, Kansas City, Mo., for Perrin D. McElroy, Public Administrator.

Hubert H. Bryant, Tulsa, Okl., for Georgia James, Paul Lean James and Mae Della Elizabeth James.

DUNCAN, Chief Judge.

This is an interpleader action brought by the plaintiff against the defendant to determine who shall receive the benefits of a policy of life insurance issued by the plaintiff upon the life of Early James, deceased.

The defendant Mary James, as the beneficiary, claimed the proceeds of the policy. Perrin D. McElroy, as public administrator, claimed the proceeds of the policy for the benefit of Georgia James, the lawful wife of Early James, Paul Lean James and Mae Della Elizabeth James, minor children of Early James, who were non-residents of the State of Missouri. A guardian ad litem was appointed for the minor children.

There is no dispute as to the facts. The controversy arises over the inferences to be drawn from those facts. The deceased and Georgia James were married some time prior to 1950 (the record does not reveal the date). Of that marriage the two children named in the complaint were born. That marriage was in existence at the time of the death of said Early James.

Early James and the defendant Mary James began living together without the benefit of clergy (common law marriages are no longer recognized in Missouri) about 1949, and continued to do so until the time of James' death on May 14, 1960. It was during this period that the policy of insurance in the amount of $1,000.00 was issued to Early James upon his life. In the application he designated Mary James as beneficiary, and described her as his wife.

Their connubial or conjugal relations were apparently not of a tender affectionate nature, but were the violent, stormy type, frequently bordering on the sadistic. The records of the Police Department reveal that from 1941 to 1961, the deceased was arrested 35 times, and, over a shorter period of time, Mary James was arrested 21 times. 8 of these arrests were for fighting with each other.

The violence of their fights, as evidenced by their records, reveals that Mary shot Early on two different occasions. On three occasions she cut him more or less severely. On each occasion she was arrested and charges were filed against her in accordance with the severity of the offense. The acts of violence heretofore enumerated did not include other instances of a less serious nature, which did not come to the attention of the police.

The deceased admittedly came to his death as the result of a stab wound inflicted by Mary James, the beneficiary.

During most, if not all of the time they lived together a guest was also in their home. Sometimes he was a mutually welcome guest, and at times he was the guest of one or the other party. Most of the time he was a mean, old, troublemaker, and took great delight in arousing a combative attitude between Early and Mary. It was not a new role for the old fellow. He had caused much trouble for many other couples. His name is "John Barleycorn".

Some time before his death, Early found a new friend. He was a foreigner, a polished, suave blond individual who had been trained in the more subtle art of creating trouble. He knew how to bring about suffering and distress while pretending to cultivate peace and quietude. His name is "Vodka".

On the fatal day, Mary and a girl friend, after leaving their employment, picked up Early and a boy friend in Mary's automobile, and after visiting a tavern for a few before-dinner drinks, they retired to the more private surroundings of Mary's house. There they found Vodka awaiting them, and he soon began to make his diabolical influence felt. The guests left.

Early conceived the idea that Mary might likely be the subject of an attack from the opposite sex, and that she should receive some instructions in the art of self-defense. He cautioned her to always lock the doors of her car. Apparently Mary did not take to this advice too kindly, and told him that she was perfectly capable of taking care of herself, and didn't need any protection, but Early persisted.

Whereupon, according to Mary, they engaged in some more or less innocent and playful scuffling such as striking and slapping each other, and probably a bit of wrestling, to make the affair more typical of their relationship. Their physical activities resulted in Mary being thrown upon the bed, which clearly evidenced to Early that she was incapable of defending herself.

We might pause here to say parenthetically, that Early was approximately six feet and weighed 150 pounds, while Mary was five feet four and weighed 230 pounds. She advised him that he could not hold her in that position if she did not desire that he do so. Whether or not she was released from his fond embrace or the wrestler's hold by her own efforts, or was voluntarily released, does not appear from the evidence.

At any rate, Mary was released and Early obtained a large butcher knife from the kitchen for the purpose of instructing her in the art of self-defense against attack with a lethal weapon. In order to make the lesson more realistic, and to simulate the realities of actual combat, Mary also obtained a butcher knife, one with a long slim blade, known as a "boning knife".

Thereupon the gladiators set to, cutting and slashing and demonstrating the art of attack and defense while Vodka cheered them on. The evidence reveals that early in the affray, Mary received a slight wound, but the pupil soon became the master, and being shorter in stature, she slipped beneath the guard of her instructor and slashed him across the arm. She again found the mark with a thrust and the blade entered Early's body. Early collapsed and so ended the lesson.

Mary put the knives away and called the police. When they arrived they found Early wounded as described above, partly on the bed and partly on the floor, where he had collapsed. He was taken to the hospital where he died shortly thereafter.

Mary was charged with murder. Her defense was that the whole thing was an accident or a horrible mistake. Whether the jury believed her fantastic story or whether they felt she was justified in what she did, is not known, but she was found not guilty.

The other defendants say that Mary's act was intentional, and that as the beneficiary, she cannot enjoy the benefits of her unlawful and felonious act.

Mary's story that it was purely accidental and the result of a simple playful mood, is unworthy of belief. However, the law applicable to the situation is well settled. There is no question but that a beneficiary who feloniously takes the life of the insured cannot recover his estate nor any proceeds from his life insurance. Grose v. Holland, 357 Mo. 874, 211 S.W.2d 464; Perry v. Strawbridge, 209 Mo. 621, 108 S.W. 641; Barnett v. Couey, 224 Mo.App. 913, 27 S.W.2d 757; Hopkins v. Metropolitan Life Ins. Co., Mo.App., 151 S.W.2d 527.

■ One may not be permitted to profit from his own wrong. However, to deny the right of the beneficiary to the proceeds of the policy, the burden is upon those who assert such a charge or claim to show by the preponderance or greater weight of the evidence that the insured came to his death as the result

of a felonious homicide committed by the beneficiary.

While the story told by her is rather incredible, it is the only evidence before the court, except that of the members of the Kansas City Police Department who participated in the investigation, and it is the court's conclusion that the other claimants to the proceeds of the policy have not met the burden cast upon them by the law. General American Life Ins. Co., v. Cole, D.C., 195 F.Supp. 867, 1. c. 872.

■ If the killing of the insured by the beneficiary was in self-defense, it will not prevent the beneficiary's recovery. 29a Am.Jur. Insurance § 1643 (1960). I do not believe the wound was maliciously inflicted. The evidence reveals that Early first obtained the butcher knife. It may be assumed that he intended to use it. Under the circumstances, she was justified in defending herself. Considering these facts as true, the insured's death at the hands of the beneficiary would not prevent her from receiving the proceeds of the policy.

It is my finding and conclusion that the defendant Mary James is entitled to receive the proceeds of the policy.

[4] As claims were being made by various parties, plaintiff found it necessary to file suit in this court to require the parties to prove their claims. It was necessary for plaintiff's counsel to appear in court on at least two different occasions and to attend a pretrial conference. It is therefore entitled to an attorney's fee in the sum of $200.00.

Although the public administrator claimed the proceeds on behalf of the widow and the two minor children, the court found it legally necessary to appoint a guardian ad litem for the minor children, who were non-residents. The guardian ad litem communicated with the parties, who resided in Oklahoma, and appeared in court at the trial of the case. He is therefore entitled to an attorney's fee in the sum of $75.00.

The aforesaid attorneys' fees to be paid by the clerk out of the funds in the registry of the court.

Form of judgment entry in accordance with the above may be submitted to the court within ten days hereof.